**LOOMIS COURIER SERVICE, INC.,**
**Plaintiff-Appellant,**

v.

**NATIONAL LABOR RELATIONS BOARD, Defendant-Appellee.**

No. 78–1858.

United States Court of Appeals, Ninth Circuit.

April 18, 1979.

---

Mark S. Ross, Lloyd W. Aubry, Atty., San Francisco, Cal., for plaintiff-appellant.

Standau Weinbrecht, Washington, D.C., for defendant-appellee.

Before WRIGHT and SNEED, Circuit Judges, and HAUK,* District Judge.

EUGENE A. WRIGHT, Circuit Judge.

The National Labor Relations Board (Board), reversing the decision of an administrative law judge (ALJ), found that Loomis Courier Service Inc. (Loomis) had discriminatorily discharged its employees and thereafter treated those employees as "new hires" in violation of §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act (Act), 29 U.S.C. §§ 158(a)(1) and (3). 235 NLRB No. 60 (1978). Loomis petitioned for review and the Board cross-petitioned for enforcement pursuant to §§ 10(e) and (f) of the Act, 29 U.S.C. §§ 160(e) and (f). We

grant the petition for review and deny enforcement of the Board's order.

While the basic dispute in this case is factual, the parties raise several preliminary legal issues concerning the alleged unfair labor practice. Only the facts pertinent to resolving these issues are presented here.

Loomis is engaged in transporting checks, business documents, and records throughout California. It operates through branch offices grouped in northern and southern regions, the northern region consisting of branch offices in Salinas, San Jose, San Francisco, Sacramento, Manteca, and Fresno. Each branch has a collective bargaining agreement with a local of the International Brotherhood of Teamsters.

The Manteca branch had been having financial difficulties due to the low population density of the surrounding area and underbidding non-union competitors.[1] Loomis repeatedly emphasized the branch's economic problems during the negotiating sessions held on October 8, November 5, 6, 12, 1975, and January 20, 1976. The possibility of closure was discussed during several of these meetings.

The employees rejected the company's proposals on December 13 and again on January 21. Robert Balk, Loomis' General Manager, closed the branch effective 3:15 p.m. on January 22. The company removed its furniture and records, terminated all employees, and sublet part of the building. It set up temporary offices in a motel 35 miles west of Manteca and outside the geographical jurisdiction of Local 439. From that location Loomis continued to supply

* Of the Central District of California.

1. The opening of Interstate 5, 30 or 40 miles west of Manteca eliminated that branch's primary value as an exchange point on the routes running between northern and southern California. As a result, Manteca became a service facility with a limited and widely dispersed clientele.

In the fiscal year ending October 31, 1975, the branch lost $13,534, a loss rate of 4% at the local level. This does not include allocated overhead for the regional and corporate operations, which increased the loss rate to 14%. In

November and December 1975, the branch lost $7,224 for a loss rate of 12% locally and 21% with allocated overhead.

Direct wages amounted to 50.7% of each revenue dollar; vacation pay, 2.3%; paid leave, .5%; and welfare costs (money paid directly to the union for hospitalization insurance and pension plans), 9.7%. Thus a total of 64% of each revenue dollar went to labor costs. The figure for San Francisco was 56%, Sacramento 57%, and Fresno 58%, each of which paid higher direct wages.

courier service to its interstate customers in the Manteca branch area.

Picketing at the Manteca branch began almost immediately and spread to the Fresno and Sacramento branches by January 26. Loomis resumed discussions with the union on January 27 and February 5.[2] The employees rejected revised company offers on January 28 and February 13. On February 19 the parties reached a final agreement. The drivers returned to work March 3 and were treated as new hires without accumulated seniority, sick leave, or vacation benefits.

When the former employees learned that Loomis was treating them as new hires, they filed grievances with the board of adjustments, a grievance resolving committee provided in the new contract. The committee was unable to resolve the dispute. The union filed an unfair labor practice charge on April 6. Amended charges were filed May 24 and June 23 and a complaint entered June 30, 1976.

After a hearing on November 3 to 5, the ALJ dismissed the General Counsel's complaint, finding that: 1) Loomis did not unlawfully threaten to close its Manteca branch office; 2) it closed the office solely for economic reasons without discriminatory antiunion motivation; 3) it intended that the closure be final and permanent; and 4) the dispute regarding seniority benefits should be resolved by the parties under the arbitration provision of their current contract.

2. The Board found that Loomis terminated its Manteca employees in order to exert extreme pressure on them in support of its bargaining position. It apparently believed that at closure the company intended to continue negotiations and ultimately reopen the branch. Loomis argues, and the ALJ found, that the company never intended to reopen the branch but was forced to reconsider when confronted with picketing in Sacramento and Fresno, harassment in the Manteca area, and the threat of extended picketing. Loomis met with the union, it asserts, in order to alleviate these problems.

3. *NLRB v. Insurance Agents Int'l Union*, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960);

The Board affirmed the ALJ's first finding but reversed the others. Characterizing Loomis' conduct as a lockout, the Board held that the permanent discharge of the work force was inherently destructive of employee rights and therefore constituted a per se violation of the Act.

■ The role of this court in reviewing the Board's order is to determine whether its decision is a proper application of the law[3] and is supported by substantial evidence on the record as a whole.[4]

## I.

## APPLICATION OF THE LAW

In *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027, the Supreme Court established two standards for evaluating employer conduct under § 8(a)(3):[5]

First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of

*Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir. 1976).

4. *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

5. The Board here found a § 8(a)(1) as well as a § 8(a)(3) violation. Both sections are governed by *Great Dane's* standards. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 380, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); *Inter-Collegiate Press v. NLRB*, 486 F.2d 837, 844 (8th Cir. 1973).

legitimate and substantial business justifications for the conduct.

*Id.* at 34, 87 S.Ct. at 1798.

▮ Finding a § 8(a)(3) violation normally requires an affirmative showing that the employer's discriminatory conduct was motivated by an antiunion purpose. *Great Dane*, 388 U.S. at 33, 87 S.Ct. 1792; *Portland Willamette Co., Inc. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir. 1976). But when the employer's conduct is characterized as "inherently destructive," "unlawful motivation is presumed to exist." *Western Exterminator Co. v. NLRB*, 565 F.2d 1114, 1118 n. 3 (9th Cir. 1977). *See also NLRB v. Tahoe Nugget, Inc.*, 584 F.2d 293, 300 n. 24 (9th Cir. 1978); *NLRB v. Triumph Curing Center*, 571 F.2d 462, 474 (9th Cir. 1978); *Kaiser Engineers v. NLRB*, 538 F.2d 1379, 1386 (9th Cir. 1976); *Portland Willamette*, 534 F.2d at 1334; *Signal Oil & Gas Co. v. NLRB*, 390 F.2d 338, 343–44 (9th Cir. 1968).

▮ The phrase "inherently destructive" is not easily defined and cases finding violations under this standard are relatively rare. *See, e. g., NLRB v. Ayer Lar Sanitarium*, 436 F.2d 45, 50 (9th Cir. 1970). It is generally acknowledged, however, that "actions creating visible and continuing obstacles to the future exercise of employee rights" are inherently destructive. *Portland Willamette*, 534 F.2d at 1334. *Cf. American Ship Building Co. v. NLRB*, 380 U.S. 300, 309, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); *Textile Workers Union of America v. Darlington Manufacturing Co.*, 380 U.S. 263, 269 n. 10, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965); *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963); *Radio Officers' Union v. NLRB*, 347 U.S. 17, 45–46, 74 S.Ct. 323, 98 L.Ed. 455 (1954).

The Board found that Loomis terminated its Manteca employees in order to exert extreme pressure on them in support of its bargaining position and continued to serve its customers after advertising for and securing a number of new employees as replacements. By taking the drastic action of discharging its employees for a coercive purpose, [Loomis] unlawfully exceeded the limits of permissible conduct which allow employers to continue to operate with replacements without disturbing the employees [sic] status of their regular work force. [Loomis'] resort to the severe sanction of a lockout [in these circumstances] constituted conduct which was inherently destructive of their rights and designed to frustrate collective bargaining.

It appears from the above that the Board has based its conclusion of inherently destructive conduct on a factual finding that Loomis closed for an unlawful purpose. If so, its legal conclusion must rise or fall with the validity of its factual finding.

Thus, we are left with the crucial issue whether the Board's conclusion that Loomis conducted a lockout for a coercive purpose is supported by substantial evidence on the record as a whole. Accordingly, we turn to the Board's factual findings.

## II.

## FINDINGS OF FACT

### A. *Standard of Review When the Board and the ALJ Disagree.*

▮ The standard of review does not change simply because the Board has disagreed with the ALJ. *NLRB v. Warren L. Rose Castings, Inc.*, 587 F.2d 1005, 1008 (9th Cir. 1978). "We must still start with the finding made by the Board and accept it if it is supported by substantial evidence." *NLRB v. Pacific Grinding Wheel, Inc.*, 572 F.2d 1343, 1347 (9th Cir. 1978).

▮ The Board is free to draw its own inference from all the circumstances, if drawn from credited testimony, and need not accept self-serving declarations of intent, even if they are uncontradicted. *Id.; Penasquitos Village Inc. v. NLRB*, 565 F.2d 1074 (9th Cir. 1974).

▮ When credibility is at issue, as it is here, the ALJ's conclusions "assume added importance because [he] 'has the responsibility of evaluating the credibility of witnesses and the weight to be given their

testimony.'" *Dalewood Rehabilitation Hospital, Inc. v. NLRB*, 566 F.2d 77, 80 n. 3 (9th Cir. 1977), *quoting NLRB v. Vegas Vic*, 546 F.2d 828 (9th Cir. 1976). In addition, when the "determination of motive or purpose hinges entirely upon the degree of credibility to be accorded the testimony of interested witnesses, 'the credibility findings of the Trial Examiner are entitled to special weight and are not to be easily ignored.'" *Ward v. NLRB*, 462 F.2d 8, 12 (5th Cir. 1972). (Quoted in *Penasquitos*, 565 F.2d at 1077.) *See also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951).[6]

 The relative deference to be given each tribunal when the Board and ALJ disagree on the facts[7] is well defined in our decision in *Penasquitos*. There we articulated two important principles: 1) a reviewing court will not sustain a factual finding which rests solely on discredited evidence; and 2) even when there is independent, credited evidence of the Board's decision, a reviewing court will scrutinize the Board's findings of fact more critically if they contradict the ALJ's factual conclusions than if they accord with the ALJ's findings. *Penasquitos*, 565 F.2d at 1076–78. See *Universal Camera Corp. v. NLRB*, 340 U.S. at 488, 71 S.Ct. at 464 (the "substantiality of evidence [in support of the Board's decision] must take into account whatever in the record fairly detracts from its weight."); *Polynesian Cultural Center, Inc. v. NLRB*,

582 F.2d 467, 475 (9th Cir. 1978); *Warren L. Rose Castings*, 587 F.2d at 1008; *NLRB v. Interboro Contractors, Inc.*, 388 F.2d 495, 499 (2d Cir. 1967).

"Thus, evidence in the record which, when taken alone, may amount to 'substantial evidence' and therefore support the Board's decision, will often be insufficient when the trial examiner has, on the basis of the witnesses' demeanor, made credibility determinations contrary to the Board's position." *Penasquitos*, 565 F.2d at 1078. *See also Pittsburgh-Des Moines Steel Co. v. NLRB*, 284 F.2d 74, 87 (9th Cir. 1960).

B. *Review of the Board's Findings.*

The Board's conclusion that the company conducted an impermissible lockout rests on these findings:

(1) Loomis continued to negotiate with the union after the closure to improve its bargaining position;

(2) it advertised for and secured a number of replacements to service its Manteca customers; and

(3) it ultimately resumed its operations at the Manteca location.

1. *Post-closure negotiations.*

In its brief the Board asserts that it "accepted the administrative law judge's finding that the intention to close was prompt-

---

6. In *Penasquitos*, the Board reversed the ALJ's decision and found violations of §§ 8(a)(1) and (3). The court denied enforcement.

 Judges Duniway and Choy expressed reservations with Judge Wallace's adoption of a "dichotomy between 'credibility determinations based on demeanor . . . *testimonial inferences*' and those based on 'inferences drawn from the evidence itself—. . . derivative inferences.'" *Penasquitos*, 565 F.2d at 1084. They did not disagree with "[t]he notion that special deference is owed to the determination of a trier of fact, . . . because the trier 'sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records.'" *Id.*

 Consequently, Judge Duniway concurred that the "evidence as a whole, including the credibility rulings of the administrative law judge, seems to me too thin to be called substantial

support for the Board's [finding of an 8(a)(1) violation]". *Id.* at 1087. Judge Choy agreed and also voted to reverse the Board's finding of an 8(a)(3) violation. *Id.*

 In the present case, the ALJ did not base his credibility findings solely on demeanor but on a "review of the *entire* testimonial record and exhibits, with due regard for the logic of probability, the demeanor of the witnesses, and the teachings of *NLRB v. Walton Mfg., et al.*, 369 U.S. 404, 408, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962)."

7. In its brief, the Board asserts that "there are no significant differences between the findings of the Board and the Administrative Judge." While the tribunals agree on some points, they do not agree at all on the purposes or motives behind Loomis' conduct, which, as the Board admitted, is the central factual issue in this case.

ed by valid economic considerations."[8] In its opinion, however, it stated that Loomis discharged its employees "for a coercive purpose." By this language, we assume that the Board's position on appeal is the same as that taken by General Counsel at trial—that Loomis never intended a permanent shutdown.

After several months of negotiations, on January 20 Balk met with representatives of the local and Charles Ciolino, a Teamster official called into the negotiations at that time by union officials outside the union. The union officials increased its demand by asking for parity with the San Francisco branch. Balk explained the branch's dire financial circumstances. Lengthy discussion followed. Ciolino stated that "if he was in [the company's] position, he would close down the . . . place."

At the end of the meeting, the company told Richard Parra, Business Agent for Local 439, by letter that if the company's "final offer is not accepted we will be forced to close the Manteca Branch and terminate the Courier Drivers."

As the meeting was breaking up, Balk testified, Ciolino "indicated that we were within our legal right to [close], and if we decided to do that, that he wouldn't blame us, that there would not be any additional ramifications on the part of the union against the company" as long as the company continued to abide by the union's jurisdictional policy.

Balk emphasized that it would not be possible for the company to cut off its statewide customers who did business in the Manteca area. Ciolino acknowledged this. Balk also testified that Ciolino confirmed this understanding the following day.

Johnson also testified that on January 22, after being informed of the closure, Parra "said there will be no further action on the part of the Union if we close the branch, that's it. That is as far as we will go."

Johnson's testimony revealed that Hatton, president of the local, "also reaffirmed that the Union would take no action if the branch was closed." The ALJ expressly credited Balk's and Johnson's testimony.

Parra, whom the ALJ discredited, testified to the contrary: "I told Mr. Johnson most certainly the company had the right to close any facility, but that if I found out they were going to be operating within the geographical area we serviced, that we were going to have problems . . . ." He also testified that he had first been advised that the company was "considering closing" on January 20, but later admitted that during one of the November meetings, it was mentioned that if the company "had to, they would just close the facility."

Parra testified that in November he had told Johnson: "Maybe you better close up" and, as long as Loomis did not operate in the geographical area, "there would never be any problems."

The judge asked: "This was in November?"

Witness: "Yes, sir. I informed them one time in November. This came up at two or three meetings."

The Board disagreed with the ALJ and credited Parra's testimony.

On Thursday, January 22, Parra decided to start picketing the branch. On the 23rd, Johnson learned that permission had been given to extend the pickets to Fresno and Sacramento. He was also told by union officials that picketing might extend into the San Francisco area. On Monday, January 26, pickets had arrived at the Fresno and Sacramento branches.

Balk testified that as of January 22 he "had no intention of ever opening the doors in Manteca again." He maintained that the company met with the union because they had been advised that locals in other parts of the West Coast might shut down the

---

8. The Board noted that "Balk's intentions as found by the administrative law judge were completely legitimate." The Board went on to argue that, while Loomis was within its rights to close the branch and transfer its business to neighboring branches, it could not accomplish this "by discharging these people and then by continuing operations outside the contract relationships."

company's operations if Manteca were not reopened.[9] The ALJ expressly credited this testimony.

After hearing that the picketing might extend into other areas, threatening not only the entire courier service, but the armored car service as well, Johnson set up a meeting with Ace Hatton, the new president of the Local, for the evening of January 27. The company improved its offer slightly. The employees rejected the offer on January 28.

Johnson sent a telegram on January 29 under Balk's signature, inviting the Manteca employees to discuss the company's proposal. On January 31 Johnson sent a letter to each employee indicating that the company was "trying to retain all the customers we can in the Manteca area by operating at the present time from other areas so that if and when we can get back to work in Manteca we can provide as many jobs as possible."

A meeting was held February 5 in Sacramento with George Mock who indicated that the best way to prevent extension of the pickets was to reopen the office. As a result, a new proposal was submitted by the company on February 9 but rejected February 13. At another meeting on February 19 the company agreed to reopen the branch on March 3.

Balk asserts that he intended to close the branch permanently, believing that he could ultimately transfer most of the work to other units without violating the union's jurisdictional policy. The union's economic action forced him to change his mind.

None of the evidence relating to the negotiations which recommenced on January 27 is inconsistent with Balk's explanation. Therefore, it cannot be relied on to support the Board's finding that Balk never intended to permanently close the branch. Parra's testimony contradicts Balk's version of the "understanding" between the company and the union regarding the transfer of Manteca's business to other branches, indicating that Balk was not justified in believing the union would take no action if the company continued to service its Manteca customers.

The ALJ discredited this testimony. Consequently, the Board's finding that the company continued to negotiate in order to improve its bargaining position, rather than to prevent extension of the pickets, rests solely on discredited testimonial evidence.

2. *Operation With Replacements.*

Loomis advertised in the classified section of a Stockton newspaper:

"DRIVERS—Courier. Applications now being accepted for full and part time positions at our Manteca office. . . . Apply December 22, 23, between 9 A.M.—noon. See Mr. Jones at Loomis Courier Service. . . ."

Johnson testified without contradiction that "we had an opening, and we were trying to fill it, which goes on all the time at various branches." Contrary to the ALJ's conclusion, the Board rejected Johnson's explanation, finding that the ad was run for the purpose of "securing a number of new employees as replacements."

There is no evidence that Loomis hired any temporary employees from this advertisement. The only temporary employee who testified indicated that she learned of the job through a friend. The Board's finding is without substantial support in the record.

David Marable, a discharged employee, testified that on January 20 and 22 Wallace McNeice rode with him to learn his route. Marable admitted that he did not know whether McNeice was a Loomis employee, or that McNeice was not driving a Loomis vehicle but a private car, or that McNeice delivered the material he had picked up to Fry Brothers, a Loomis competitor. The Board noted that "Marable testified with-

---

9. Balk testified: "I was faced with the situation regardless of what I wanted to do at this stage that if for a $40,000 a month revenue operation, I was going to jeopardize more than a million dollars a month for this, that perhaps I had no alternative but to continue to talk to the union to try to keep from being shut down entirely, the whole company."

out contradiction that on February 6 he saw McNeice make deliveries for [Loomis] Respondent within the Manteca area."

Balk testified that, although they had been notified previously of the possibility of a closure, supervisors were not called into Manteca until after the decision on January 21 to close. They arrived the next morning. Balk's testimony was credited by the ALJ and Marable's discredited. No inference of illegal motive is warranted by Marable's testimony.

According to Balk, Loomis intended to transfer Manteca's business to neighboring branches. Routing experts were sent to Livermore for this purpose. Balk estimated the transfer would take from five to ten days but testified that "it took far longer to do than I had anticipated." The delay was due in part to harassment of Loomis' vehicles in the Manteca area.

The major portion of the transfer was completed, Balk testified, with drivers from Fresno, Sacramento, and San Francisco picking up some of Manteca's work. There is no evidence how far along the process was before the decision was made to discontinue the transfer. Balk called for supervisors from other areas and hired temporary personnel to service the remaining Manteca customers while the rerouting was being done.

At oral argument, the Board asserted that it was improper for Loomis to use nonunion personnel to assist in transferring Manteca's business. It cites no authority nor do we find any to support this assertion.

In rejecting Balk's credited explanation for the planned transfer, the Board stated:

Although the Administrative Law Judge found that Respondent originally intended to phase out its Manteca operations and would have done so but for the Union's picketing, the record clearly shows that Respondent did continue to service many, if not all, of its customers from Livermore and did resume its operations at the Manteca location."

Apparently the Board assumed that if the company's intent to close were bona fide, it would have completed the transfer of the Manteca operations before the new contract was settled. It also assumes that the job should have been completed within the 29 days between the closure and the date a new agreement was reached.

There is simply no evidence to support these assumptions. Nor is it clear from the record whether Loomis even intended to complete the rerouting after negotiations reconvened. Once he resumed negotiations, Balk would have had little reason to complete the rerouting. Under the circumstances, the law did not require that he do so.

3. *Reopening.*

■ Upon resuming operations out of Manteca, 16 of Manteca's original 19 routes were restored. Three continued to operate from Livermore. The Board inferred from the fact of reopening that Loomis intended the closure for a coercive purpose. Such an inference assumes an ultimate fact and cannot by itself constitute sufficient evidence to support the Board's finding.

*CONCLUSION*

■ The Board inferred from the advertisement, the use of replacements, and the reopening that Loomis never intended to close its Manteca branch permanently. These facts, however, are equally susceptible to contrary inferences. In addition, Loomis reasonably accounted for each circumstance.

In such cases, the credibility findings of the ALJ assume added importance and may not be ignored. As we stated in *Pittsburgh v. Des Moines Steel*, 284 F.2d at 87, the Board should not "be permitted either to draw unwarranted inferences to reverse a finding of credibility made by the Trial Examiner or to discard positive findings of credence in favor of inferences drawn from tenuous circumstances."

Because the circumstances upon which it relies are so equivocal, we find that the Board had an insufficient basis to reverse the ALJ's credibility findings. As a result, the record considered as a whole does not

contain substantial evidence supporting the Board's factual findings. Since the Board's conclusion that Loomis conducted a lockout in order to exert extreme pressure on the union is based on findings unsupported by substantial evidence, that conclusion cannot stand.

ENFORCEMENT DENIED.

SNEED, Circuit Judge (dissenting):

I would grant enforcement of the Board's order. While I do not disagree with Judge Wright's statement of the proper standard of review when the Board and the Administrative Law Judge disagree, I do believe that the majority has misapplied the standard. Its scrutiny of the Board's findings as they relate to the operation of Loomis with replacements and the reopening by Loomis of its Manteca operations results in the substitution of its judgment for that of the Board. "Close scrutiny" should not become the vehicle for ignoring reasonable inferences drawn by the Board from uncontested facts. An inference may be reasonable even though a contrary inference may be equally reasonable.

I respectfully dissent.