**STEIN SEAL COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 78–2252.

United States Court of Appeals, Third Circuit.

Argued July 13, 1979.

Decided Sept. 4, 1979.

Thomas J. Renehan, Jr. (argued), Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for petitioner.

Anton Hajjar (argued), Robert Sewell, Michael Hamilton, Attys., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

Before ADAMS, ROSENN and HIGGINBOTHAM, Circuit Judges.

### OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

Stein Seal Company ("the Company") petitions for review of a final order of the National Labor Relations Board ("the Board") finding that it committed unfair labor practices by threatening to retaliate against employees because of their union activity, by restricting employee Ihor Shapolowenko's in-plant movements in order to stop his union discussions and by discharging Shapolowenko because of his union activity. The Board filed a cross-application for enforcement of its order. The petition for review will be denied and we will enforce the Board's order insofar as it relates to violations of Section 8(a)(1) of the National Labor Relations Act, as amended, ("the Act"), 29 U.S.C. § 158(a)(1),[1] arising from the implied threat of retaliation and the restriction of Shapolowenko's in-plant movements. We will deny enforcement of the order relating to the discharge of Shapolowenko.

### I.

Stein Seal Company is engaged in the engineering, development and manufacture of custom shaft seals at its plant in Philadelphia. It employs seventy persons, approximately forty-nine of whom are production or maintenance employees. The unfair labor practice charges involved in this appeal arose from the unsuccessful efforts of District 1, International Association of Machinists and Aerospace Workers, AFL–CIO ("the union") to organize the Company's production and maintenance employees.

The Regional Director for the Fourth Region of the Board, in response to an amended charge filed by the union, issued a complaint against the Company which charged that it was guilty of seven unfair labor practices: during a speech to employees, Dr. Philip C. Stein, the founder, president and co-owner of the Company, threatened to close the plant if the union won the election; Dr. Stein made a similar remark to Ed Goldring, a vice president of the Company, and William Drisch, an employee, which was overheard by another employee,

---

1. Section 8(a)(1) provides
    (a) It shall be an unfair labor practice for an employer—
        (1) [T]o interfere with, restrain, or coerce employees in the exercise of the right guaranteed in section [7];

Section 7, 29 U.S.C. § 157, concerns, among other things, the right of employees to organize and bargain collectively with representatives of their own choosing.

Fred Torzon; Dave Baumann, a supervisor, made coercive statements to Walter Waerig and Ihor Shapolowenko, two employees who supported the union; Tie Eldridge, a supervisor, unlawfully interrogated William Bryan, an employee; Dr. Stein threatened retaliation against Shapolowenko during a speech to the employees; the Company unlawfully restricted Shapolowenko to his work area during the election campaign; and Shapolowenko was discharged by Dr. Stein after the election because of his union activities. The Company denied all the unfair labor practice allegations.

A hearing on the charges was held before an administrative law judge who found that the Company had violated Section 8(a)(1) of the Act by the following acts: Dr. Stein's statement in a speech to employees that he had received offers to buy the business; Baumann's conversation with Waerig and Shapolowenko; and Eldridge's interrogation of Bryan. He dismissed the complaint, however, insofar as it alleged that Dr. Stein stated in the presence of Torzon that he would close the plant if the union won the election. He also concluded that Dr. Stein had not threatened retaliation against Shapolowenko and that the Company acted lawfully when it instructed Shapolowenko not to leave the inspection room to obtain supplies since it was not required to permit him to solicit or campaign for the union on company premises during work time. Finally, he concluded that Shapolowenko was discharged not because of his union activities but because of what Dr. Stein considered in the heat of an argument to be misconduct.

The Board affirmed the findings and conclusions of the administrative law judge with three exceptions. Contrary to the administrative law judge, the Board found that the Company violated Section 8(a)(1) by Dr. Stein's statements that impliedly warned of retaliation against employee union activity and by restricting Shapolowenko's work movements in order to stop his union discussions. The Board also found that the Company discharged Shapolowenko because of his leading role in the union activity. These three findings by the Board are the subject of this appeal.

## II. IMPLIED THREAT OF RETALIATION

During the union campaign, three captive audience meetings were held at which Dr. Stein addressed the employees. At the second meeting, Dr. Stein discussed the opportunities the Company's employees had open to them and specifically mentioned the progress made by Ihor Shapolowenko. He pointed out that Shapolowenko began his employment with the Company with no particular experience at $2.80 per hour and had progressed to $5. per hour. According to Dr. Stein's testimony, Shapolowenko had received seven or eight raises since joining the Company, and thus he had been given "full opportunity to develop himself." Transcript of Hearing, Appendix at 170a. He then stated:

> I said of course I don't know whether we can expect gratitude, but I don't feel that someone ought to bite the hand that feeds him, and I have a fingertip that is missing and I held up my hand and said, "I have one finger that is missing, and I think I ought to pull it back before I get the rest of them nibbled off".

*Id.* Based on the testimony of two employees, credited by the administrative law judge, Stein analogized Shapolowenko's lack of gratitude to that of a dog who bites the hand that feeds him. Decision of Administrative Law Judge ("ALJ Decision") at 4 n. 6, *reproduced in* Appendix at 289 n. 6. The administrative law judge concluded, however, that "nothing in Dr. Stein's words . . . constituted a threat to retaliate. His words, at most, were expressions of disappointment, annoyance and, perhaps, disgust." *Id.* at 290a.

The Board disagreed and concluded that "[t]he unmistakeable impression left on the audience was that the ungrateful Shapolowenko or any employee who did likewise would thereafter be treated differently." Decision and Order of National Labor Relations Board ("Board Decision") at 2, *reproduced in* Appendix at 307a. It held that these statements constituted, at the

very least, an implied threat of retaliation in violation of Section 8(a)(1).

Whether an employer's conduct tended to coerce or intimidate employees in the exercise of their rights under the Act is a question of fact for the Board and its determinations are conclusive if supported by substantial evidence. *N.L.R.B. v. Armcor Industries, Inc.*, 535 F.2d 239, 242 (3d Cir. 1976). Moreover, this Court has noted that:

> [T]he possibility that a statement contains an implied threat must be judged from the employee's point of view. For that reason the expertise of the Board is particularly relevant to the determination of whether a latent threat lies hidden in the words of an employer. Our scope of review is limited to inquiry as to whether the Board's determination is reasonable and supported by substantial evidence. (footnotes omitted)

*Mon River Towing, Inc. v. N.L.R.B.*, 421 F.2d 1, 9–10 (3d Cir. 1969). This requirement of sustaining the Board's findings of fact if supported by substantial evidence applies to inferences as well as to evidentiary facts. *N.L.R.B. v. Eagle Material Handling, Inc.*, 558 F.2d 160, 164 n. 6 (3d Cir. 1977). Applying these precepts to the facts of this case, we conclude that the Board's finding of an implied threat was reasonable and is supported by substantial evidence on the record as a whole.

▮ Finally, two arguments advanced by the Company in connection with this issue should be addressed. First, the Company's argument that Dr. Stein's remarks regarding his missing fingertip were made jokingly must be rejected as irrelevant. The relevant inquiry is not Dr. Stein's intent but rather the coercive inferences which the employees could have drawn. *See Mon River Towing, Inc. v. N.L.R.B.*, 421 F.2d at 9. Second, we reject the suggestion that a higher level of evidentiary support is required when the Board disagrees with the administrative law judge. It is the Board, not the administrative law judge, which is responsible for determining facts. *N.L.R.B. v. Duquesne Electric & Mfg. Co.*, 518 F.2d 701, 704 (3d Cir. 1975). Thus, the adminis-

trative law judge's findings and recommendations, when contested, become merely advisory and the Board itself makes an original disposition of the case. It may decline to follow the findings even though they are not clearly erroneous and even as to the credibility of witnesses and make contrary findings if its determination is supported by substantial evidence. *Id.*

## III.  RESTRICTION OF IN-PLANT MOVEMENT

▮ Implicated here are employees' Section 7 rights to communicate freely in the exercise of their organizational rights. In *Jeannette Corp. v. N.L.R.B.*, 532 F.2d 916, 919–920 (3d Cir. 1976), we stated:

> Once it is established that the employer's conduct adversely affects employees' protected rights, the burden falls on the employer to demonstrate "legitimate and substantial business justifications" for his conduct. *N.L.R.B. v. Fleetwood Trailer Co., Inc.*, 389 U.S. 375, 378, 88 S.Ct. 543, 545, 19 L.Ed.2d 614, 617 (1967); *N.L.R.B. v. Jemco, Inc.*, 465 F.2d 1148, 1152 n. 7 (6th Cir. 1972). In weighing the justifications offered by the employer, we must heed the Supreme Court's admonition that "[i]t is the primary responsibility of the Board and not of the courts 'to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy.'" *N.L.R.B. v. Fleetwood Trailer Co., supra*, 389 U.S. at 378, 88 S.Ct. at 546, 19 L.Ed.2d at 617, *quoting N.L.R.B. v. Great Dane Trailers*, 388 U.S. 26, 33–34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027, 1034–1035 (1967).

The Board concluded that the Company presented no justification for restricting Shapolowenko and thus violated Section 8(a)(1). The Company has not convinced us that the Board's determination should be disturbed. The Board's findings, which we hold to be supported by substantial evidence, are:

> Before the union campaign, Shapolowenko customarily went to the second floor to obtain supplies, perform his work, and

use the rest room. During the campaign, the Respondent restricted Shapolowenko to the first floor, admitting that it did so to prevent Shapolowenko from discussing and soliciting for the Union during work-time. No other employees were prohibited from talking to fellow employees. The Respondent presented no evidence that anyone's work was disrupted or that it had a valid no-solicitation rule in effect. The restriction was applied only to Shapolowenko, admittedly to prevent his union activities.

Appendix at 307a–308a. *See also N.L.R.B. v. Roney Plaza Apartments,* 597 F.2d 1046, 1048–1050 (5th Cir. 1979).

The Company begs the question when, as a justification for the restriction, it argues that Shapolowenko's "work in the inspection room on the first floor would surely be interrupted when he was not there to perform it." Brief of Petitioner at 23. Additionally, it appears from the record that rather than promoting efficiency and productivity, the restriction imposed on other employees the additional work of carrying heavy parts to Shapolowenko's area.[2]

## IV. DISCHARGE OF SHAPOLOWENKO

█ Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), provides that "[i]t shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." We are called upon to decide whether substantial evidence on the record as a whole supports the Board's finding that the Company violated Section 8(a)(3) by discharging Shapolowenko.

The factual background on the discharge of Shapolowenko is as follows. After the election, Shapolowenko was working for a time as a floor inspector. He complained that he should have received fifteen cents per hour more than he had been paid as a final inspector. The Company's position was that the two positions did not have any specific salaries attached to them and that each worker was paid according to his skills and experience. During the weeks preceding his discharge, Shapolowenko had been asking various supervisors for the fifteen-cent per hour differential. He complained to supervisor Szymborski who explained that he could do nothing about a raise but that he would speak to those with more authority. He also complained to Westerman, the production supervisor. In the meantime, he was transferred to final inspection and then back again to floor inspection. On the day prior to his discharge, he met with supervisors Baumann and Kilgus to discuss the floor inspector's job. Shapolowenko pointed out that when he had originally been put on the floor inspection some years earlier, he had been given a fifteen-cent raise and that this raise was taken away when he was transferred into final inspection. He thus insisted again on receiving the fifteen-cent differential now that he had returned to floor inspection.

On March 4, shortly after the election, Dr. Stein and Shapolowenko had spoken about a raise. At that time, Dr. Stein denied the raise. Thus, when Dr. Stein was told on March 15 that Shapolowenko had been bothering several supervisors for a raise, he decided to speak to him personally. When Dr. Stein approached Shapolowenko, he asked him what his purpose was in both-

2. Edward N. Goldring, vice president of the Company, testified:

Q. Wasn't the normal course before the union campaign for him to go upstairs to inspect that piece?
A. Yes, quite possibly.
Q. After he was restricted as referred to before, somebody would then or possibly two people would have to bring that piece downstairs for him to inspect. Isn't that true?
A. Yes.

Wait a second now. Of course it had to go down. He had to inspect it, certainly, but it is management's prerogative to decide that.
Q. That is not what I asked you.
A. Yes, of course it was.
Q. Because these things, some of them were of considerable weight, perhaps two people would have to bring them downstairs. Isn't that correct?
A. Yes.

Appendix at 258a–259a.

ering other people for something which had already been decided. Shapolowenko insisted on an additional fifteen cents per hour. Dr. Stein responded that Shapolowenko was making more money than his predecessor. According to the administrative law judge:

At this point, the argument became quite heated on both sides. Shapolowenko told Dr. Stein that Shapolowenko was free to make any requests and statements that he desired. Shapolowenko, in testifying, admitted that the conversation became heated and loud. The testimony of all of the witnesses regarding this matter was to the effect that other employees could overhear what was being said. Shapolowenko continued to insist that he would ask for a raise if he wished, even if the people whom he asked would have to go back and ask to speak to Dr. Stein again. Both Stein and Shapolowenko continued to argue and Dr. Stein finally informed Shapolowenko that if the latter could not be quiet and keep his mouth shut, he would have to leave the building. Shapolowenko refused to stop, and in the heat of the argument Dr. Stein then said "You've got to keep your mouth quiet, learn how to control your mouth or you're going to have to leave the building." When Shapolowenko disregarded this warning and continued to argue, Dr. Stein told Shapolowenko to take his card upstairs, punch it out and leave the building. There is no question that Goldring, who was standing along side the arguing duo, told Shapolowenko, "You were told to leave the building, go ahead and leave." (footnote omitted)

Appendix at 296a.

The Company argues that Shapolowenko was not discharged but was simply ordered to leave the building when he refused to cease a loud argument in the presence of other employees. However, it argues that even if he was discharged, it was not because of his union activities. We believe

there is substantial support in the record for the conclusion that Shapolowenko was discharged.[3] On the question of whether his discharge was attributed to his union activities, the administrative law judge concluded:

While the discharge is not entirely lacking in suspicion as to motivation, it is concluded that Shapolowenko was discharged in the heat of an argument over whether he was entitled to a raise and because he refused to submit to Dr. Stein's decision that Shapolowenko was not entitled to a raise, but kept insisting that he was entitled to such. The decision to discharge was a momentary matter, made spontaneously, in temper, on the part of Dr. Stein. It was a discharge which arose out of a heated argument over a nonunion matter and at a time during which Shapolowenko was not engaged in union or protected activity.

Appendix at 297a.

The Board disagreed and concluded that he was discharged primarily because of his union activities:

"Stein consciously provoked the argument that resulted in Shapolowenko's discharge by going to him and confronting him in the presence of his fellow workers.

The Respondent presented no evidence that Stein had ever before discharged an employee for insubordination or for requesting a pay raise, whether done in anger or not. Moreover, Stein denied, and the Respondent in its answering brief continues to deny, that Stein fired Shapolowenko. The Respondent, however, now indicates that if Stein did fire Shapolowenko, as found by the Administrative Law Judge, then Stein had good reason or cause for doing so. But, given the Respondent's denial that Shapolowenko was fired, the Administrative Law Judge's further finding that he was discharged for insubordination or some oth-

---

**3.** Dr. Stein directed Shapolowenko to punch his timecard and leave. Vice President Goldring added: "You were told to leave the building, go ahead and leave." Appendix at 296a. The Company made no attempt to contact Shapo-lowenko after his departure on March 15. The following day, consistent with his understanding that he had been discharged, Shapolowenko filed for unemployment compensation.

er form of misconduct (cause) is in our opinion either gratuitous or merely speculation on his part since the Respondent did not give any reasons for its action against Shapolowenko.

Appendix at 309a–310a.

Our review of the record and of the approach used by the Board leads us to conclude that the Board's finding of an unfair labor practice arising from Shapolowenko's discharge cannot be sustained. When an employer puts forward a justifiable cause for the discharge of an employee, "the Board must find that the reason was a pretext and that anti-union sentiment played a part in the decision to terminate the employee's job." *Edgewood Nursing Center, Inc. v. N.L.R.B.,* 581 F.2d 363, 368 (3d Cir. 1978). The record as a whole clearly lacks substantial supportive evidence that Shapolowenko's discharge was merely a pretext. The more reasoned and supportable conclusion is the one drawn by the administrative law judge that the discharge "was a momentary matter, made spontaneously, in temper, . . . which . . . arose out of a heated argument over a nonunion matter." Appendix at 297a.

We recognize that discerning the motivation for an employee's discharge is never an easy task. However, the nexus between Dr. Stein's admittedly anti-union attitude and his discharge of Shapolowenko is tenuous. The Board here drew the inference of an illegal discharge from Dr. Stein's earlier anti-union sentiments. It is possible for Dr. Stein to harbor anti-union feelings for the remainder of his career at the Company and not transgress the statutory prohibition merely by discharging his employees. "[I]f the employee would have been fired for cause irrespective of the employer's attitude towards the union, the real reason for the discharge is nondiscriminatory." 581 F.2d at 368.

Provided it is not done for anti-union purposes, an employer has the right to deny wage increases to any employee who seeks them. An employer does not have to suffer endless beratement in the presence of other employees because a wage increase has been denied. An employer has the right to terminate conversations which verge on patent insubordination as did Shapolowenko's confrontation. When the employee refuses to terminate the conversation, the employer can terminate the employment. Under the facts of this case, "the real reason for the discharge [of Shapolowenko was] non-discriminatory." 581 F.2d at 368.

The Board's conclusion is a result of its inaccurate characterization of certain events. First, the Board's statement that the employer gave no reason for its action against Shapolowenko is not supported by the evidence. To the contrary, we believe it is clear that its action was a result of Shapolowenko's pestering and refusal to accept Dr. Stein's clear denial of a wage increase. *See* Transcript of Hearing, Appendix at 182a–185a, 250a–253a. Second, the characterization that "Stein consciously provoked the argument" finds no support in the record. The record only reflects the fact that Stein approached Shapolowenko after learning of Shapolowenko's persistent demands and provocative conduct to various supervisors. The fact that one has been a union activist does not grant him immunity for that type of insubordination which would not be tolerated from others. The president of a company is not required by the National Labor Relations Act to remain silent in his office when supervisors report commotion in the plant where company policies are being challenged or thwarted.[4]

## V.

The petition for review will be denied and we will enforce the Board's order insofar as it relates to violations of Section 8(a)(1) of the Act arising from the implied threat of

4. Of course the events of Shapolowenko's termination are different from those in *N.L.R.B. v. Roney Plaza Apartments,* 597 F.2d 1046, 1051 (5th Cir. 1979) where the "interrogation and orders concern[ed the employee's] engaging in protected activity." As we have noted, Shapolowenko's confrontation, which led to his termination, was not within the realm of protected activity.

retaliation and the restriction of Shapolowenko's in-plant movements. We will grant the petition for review, reverse the order of the Board, and deny enforcement of the Board's order insofar as it relates to the discharge and reinstatement of Ihor Shapolowenko.

Each party shall bear its own costs.