**BUTLER–JOHNSON CORPORATION,
Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 78–3078.

United States Court of Appeals,
Ninth Circuit.

Nov. 28, 1979.

As Amended Dec. 20, 1979.

Michael J. Hogan, Fresno, Cal., Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., for petitioner.

Jessie I. Etelson, N.L.R.B., Washington, D. C., for respondent.

Before WRIGHT and ANDERSON, Circuit Judges, and JAMESON, Senior District Judge.*

EUGENE A. WRIGHT, Circuit Judge:

The Board found that petitioner violated Section 8(a)(1) and (3) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1) and (3), by the coercive conduct of a supervisor and by the discriminatory discharges of two warehousemen. The Board's decision reversed that of the Administrative Law Judge (ALJ) on all issues.

The company petitioned for review of the Board's decision, and the Board filed a cross-application for enforcement of its order requiring the employer to cease and desist unfair labor practices and to reinstate the discharged employees with back pay.[1] This court's jurisdiction derives from Section 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f).

We hold that the conduct of the supervisor is not attributable to the employer and that both discharges were for legitimate business reasons. We reverse the decision of the Board and deny enforcement of its order.

## FACTS

Petitioner, Butler-Johnson Corporation, located in Sacramento, is a wholesale distributor of building and flooring materials. Its president is Dan Ford. In 1975, Ford named Joe Secco the "internal operations manager" in charge of office sales and accounting personnel, warehousemen, and truck drivers. Ford also named Jim Secco (Joe's cousin) the "day warehouse foreman," and Robert Mozingo the "night warehouse foreman." Including the two Seccos and Mozingo, Ford had 21 employees in Sacramento in 1976.

None of petitioner's employees was unionized until January 1976, when a majority of the company's three truck drivers and seven warehousemen voted to be represented by a local of the Teamsters Union. The election followed a number of secret employee meetings late in 1975 that had been organized by Mozingo and night warehouseman Curt Nelson. Jim Secco attended at least one of the meetings. During the pre-election period, Secco lobbied against the union.

In February and March 1976, Secco continued to express his anti-union views to his fellow employees during informal conversations in the warehouse. In one of those conversations he told Nelson and Mozingo that Ford would eventually "phase out" the employees responsible for the union campaign.

In March 1976, Ford terminated Nelson after being advised by his insurance broker that Nelson's insurance coverage would be unduly expensive because his driver's license had been suspended. The risk of not insuring Nelson was considerable, for his

* Of the District of Montana.

1. The Board's order is reported at 237 N.L.R.B. No. 95 (1978).

warehouse job required him to drive forklifts and trucks on company premises.

In August 1976, Ford discharged Mozingo after learning of an argument between Mozingo and Jim Secco. During the argument, witnessed by several other employees, Mozingo yelled loudly, made derogatory comments about the company and Ford, and kicked a box of formica. The preceding May, after a similar outburst by Mozingo, Ford had warned Mozingo that such behavior would not be tolerated.

The union and Mozingo filed charges against petitioner with the National Labor Relations Board, claiming that the discharges and Secco's remarks were violations of Section 8(a)(1) and (3) of the Act.[2] The ALJ decided that, because Secco was not a supervisor, his conduct was not attributable to petitioner. The ALJ also decided that neither discharge was retaliatory. The Board reversed the ALJ, finding that Secco was a supervisor and that the discharges were unlawfully motivated.

## DISCUSSION

### Standard of Review

This court will enforce an order of the NLRB if the Board's findings are supported by substantial evidence on the record as a whole and if it applied the law correctly. 29 U.S.C. § 160(e) (1976). *Los Angeles Marine Hardware Co. v. NLRB,* 602 F.2d 1302, 1305 (9th Cir. 1979).

■ Although the standard of review does not change when the Board's decision is contrary to that of the ALJ, the weighing of the evidence can be affected by the

incongruity. When credibility is at issue or when findings of motive or purpose depend entirely upon credibility, the decision of the ALJ will be given special weight. Moreover, even when there is independent evidence to support the Board's decision, the Board's findings of fact will be scrutinized more critically if they contradict those of the ALJ. *Loomis Courier Serv., Inc. v. NLRB,* 595 F.2d 491, 495–96 (9th Cir. 1979).

*The Section 8(a)(1) Violation: Jim Secco's Conduct.*

■ Jim Secco's remarks constitute a Section 8(a)(1) violation only if they were (1) threatening and (2) attributable to the employer.

This court has said that an employer's right of free speech is not restricted by the Act so long as the employer's statements about unionism or a specific union "do not contain a 'threat of reprisal or force or promise of benefit.'" *NLRB v. General Tel. Directory,* 602 F.2d 912, 915 (9th Cir. 1979), quoting *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 618–19, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969). Because Secco's statement that Ford would fire employees instrumental in bringing the union to the company contains a clear "threat of reprisal" for union activities, the controlling question is whether the statement can be attributed to the employer.

The Board determined that Secco's comments were attributable to his employer because he was a "supervisor" within the meaning of Section 2(11) of the Act, 29 U.S.C. § 152(11) (1976).[3] Although the

---

2. Section 8(a)(1) provides that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees" who are exercising the rights guaranteed by Section 7 of the Act. 29 U.S.C. § 158(a)(1) (1976). Section 7 guarantees employees the right to self-organize, to form, join, or assist labor organizations, to bargain collectively, to engage in other activities for the purpose of collective bargaining or mutual aid or protection, and to refrain from any of these activities. 29 U.S.C. § 157 (1976).

Section 8(a)(3) provides in relevant part that it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of

employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3) (1976).

3. Section 2(11) defines as a supervisor

any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a

Board's conclusion that Secco is a supervisor has support in the record,[4] he was a supervisor only in the most technical sense of Section 2(11).

The small work force of warehousemen and truck drivers was already subject to active supervision by Ford and Joe Secco. Jim Secco had no authority to hire, promote, or discharge employees or even to recommend such action. Moreover, as "day warehouse foreman," he was in charge of only three other warehousemen. Much of his day was spent doing the same work as the other warehousemen which work, for the most part, was repetitive and routine.

Secco voted as an employee in the union election and his vote was not challenged by the union or the company. His relationships with other employees were casual and generally friendly.[5]

Secco's position as a low-level supervisor is not conclusive of petitioner's liability. His comments are attributable to petitioner only if the employees who heard them had "just cause" to believe petitioner authorized them. *NLRB v. Texas Independent Oil Co.,* 232 F.2d 447, 450 (9th Cir. 1956).

As this court has previously observed, statements by low-level, marginal supervisors "are more likely to express individual views and less likely to influence the employee's decision than statements by high-level officials which bear the imprint of

company policy." *Hecla Min. Co. v. NLRB,* 564 F.2d 309, 315 (9th Cir. 1977).

There is no evidence that petitioner authorized Jim Secco's comments. Furthermore, because Secco voted in the union election and the other employees knew that his anti-union animus was personal,[6] they did not have "just cause" to believe Secco made his threatening remarks about the union on behalf of management. Therefore, petitioner should not be held accountable for those remarks.

*The Section 8(a)(3) and (1) Violations: The Discharges.*

 The Board, reversing the ALJ, found that Curt Nelson and Robert Mozingo were fired for unionizing company employees. Petitioner contends that the discharges were the result of legitimate business considerations. This court has said that "[a] § 8(a)(3) violation requires normally that the Board make an affirmative showing that the employer's discriminatory conduct was motivated by an antiunion purpose." *Los Angeles Marine Hardware Co., supra,* at 1307.

*Nelson's Discharge.*

The Board found that the firing was related to Nelson's union activity because (1) the employer did not fire Nelson when his driver's license was suspended in November 1974; (2) moving trucks was not an essential part of the warehouseman position; (3)

---

merely routine or clerical nature, but requires the use of independent judgment.
29 U.S.C. § 152(11) (1976).

4. The enumerated functions in Section 2(11) are to be read in the disjunctive, and the existence of any of them, regardless of the frequency of their performance, is sufficient to confer supervisory status. *NLRB v. St. Francis Hospital of Lynwood,* 601 F.2d 404, 420 (9th Cir. 1979). The record reveals that Secco exercised independent judgment in the performance of his duties at least once: when Mozingo was ill, Secco personally reassigned employees so that one of them could cover for Mozingo. This court will defer to the Board in Section 2(11) decisions if the Board's decision "has 'warrant in the record' and a reasonable basis in law." *NLRB v. Doctors' Hospital of Modesto, Inc.,* 489 F.2d 772, 776 (9th Cir. 1973), quoting

*NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944).

5. Secco and Mozingo argued frequently. These arguments apparently stemmed from personality differences and were exacerbated by the differing opinions of the two men about the value of the union.

6. In response to a question about what was said during the employees' frequent informal conversations about the union, Nelson testified

It was more or less the same context. It was myself or Bob Mozingo supporting the union and Jim Secco taking the non-union point of view and telling us that he had been in the union before and it never did him any good.

Nelson's replacement had a severe vision impairment; and (4) Jim Secco had said that Ford would cleverly terminate employees involved in the union organizing, and Nelson had been an active union organizer.

When the record is viewed as a whole, considerable other evidence comes to light. The record makes clear that petitioner did not contrive the insurance problem. The insurer discovered that Nelson's license had been suspended when it made a routine check of the employees' driving records prior to writing a new company policy.

When Ford was informed that the policy would exclude Nelson, he inquired about the possibility of an additional policy to cover Nelson. Ford learned that such a policy would cost considerably more than insurance for other employees and would limit Nelson to driving a single vehicle.

Nelson had been a truck driver for petitioner before his license was suspended. He was the night warehouseman who was best able to move the trucks into and out of loading position, and he spent 20 to 30 minutes each night doing such driving. The possibility of an accident while Nelson moved the trucks on company premises was not remote. In October 1975 he had collided with an automobile while backing a truck from the yard into the street.

The Board found that the warehouseman position in general did not require driving. Ford testified, however, that he wanted all-night warehousemen to be able to move the trucks around. Moreover, the warehousemen needed to drive forklifts, and Ford's insurance broker had warned that the one-vehicle insurance exclusion might include forklifts.

The Board also emphasized the fact that Nelson's replacement could not drive a truck because of his poor vision. Petitioner did not discover the extent of that handicap until the man began working. As soon as it was discovered, the replacement was fired. The man hired to replace him was an experienced truck driver.

There is no evidence that Ford, at the time he discharged Nelson, even knew of Nelson's role in organizing company employees.

The ALJ found that there was insufficient evidence to infer a discriminatory motive in Nelson's discharge. This finding of no motive is entitled to added weight. *Loomis, supra.* In light of this finding and the evidence just discussed, we hold that the Board's conclusion that petitioner violated Section 8(a)(3) and (1) by firing Nelson is not supported by substantial evidence.

*Mozingo's Discharge.*

The Board concluded that Mozingo's discharge was an unfair labor practice because (1) Mozingo's hot-tempered personality and argumentative conduct had not concerned Ford prior to the union election; (2) Ford had torn up written probationary warnings given to Mozingo in May; (3) Mozingo's discharge did not conform to the company's policy of placing an employee on probation for up to six months; and (4) Secco had said Ford would cleverly terminate employees involved in union organizing, and Ford knew of Mozingo's strong advocacy for the union. As with Nelson, however, there is significant additional evidence in the record concerning the discharge.

There is evidence that at least one other employee was discharged without a probationary warning. More importantly, there is evidence that Mozingo had been warned orally about his temper.

In May, Ford had given him written warnings about three incidents of misconduct, one of which was an emotional outburst directed at Jim Secco. When Mozingo explained these incidents, Ford tore up the warning letter but orally stated that he would not tolerate continued outbursts. It was just such an outburst, again directed at Jim Secco and witnessed by other employees, that led to Mozingo's discharge.

Although Mozingo personally had told Ford that he supported the union, there is no other evidence that Ford fired Mozingo

because of his pro-union sentiments. As pointed out by petitioner, had Ford been looking for a pretext to fire Mozingo, he could have done so in May after the three incidents. Again, we must give added weight to the ALJ's finding that there was no discriminatory motive behind Mozingo's discharge. *Loomis, supra.*

This case is similar to one recently decided by the Eighth Circuit. In *Stein Seal Co. v. NLRB*, 605 F.2d 703 (3rd Cir. 1979), an employee was discharged after arguing persistently with supervisors and the company president about a denied pay raise. Although the Board found that the employee had been discharged because of his union activities, the court disagreed. It stated:

> The fact that one has been a union activist does not grant him immunity for that type of insubordination which would not be tolerated from others. The president of a company is not required by the National Labor Relations Act to remain silent in his office when supervisors report commotion in the plant where company policies are being challenged or thwarted.

605 F.2d at 709.

We hold that there is not substantial evidence in the record to support the conclusion that Mozingo's discharge was motivated by an anti-union purpose.[7]

We reverse the Board's decision and deny enforcement of its order.

---

7. Because we conclude that Mozingo's discharge was not the result of anti-union animus, we shall not consider the question whether Mozingo was a supervisor and therefore excluded from the protections of the Act.