**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FLEETWOOD TRAILER CO., Inc.,**
Respondent.

No. 20511.

United States Court of Appeals
Ninth Circuit.

Sept. 8, 1966.

Ely, Circuit Judge, dissented.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore, Daniel Harrington, Attys., N.L.R.B., Washington, D. C., for petitioner.

Hugh J. Scallon, Gibson, Dunn & Crutcher, Santa Ana, Cal., for respondent.

Before POPE, BARNES and ELY, Circuit Judges.

BARNES, Circuit Judge:

This is a petition for the enforcement of an order of the National Labor Relations Board. It had jurisdiction of the unfair labor practice complaint alleged in this case pursuant to 29 U.S.C. § 160 (a) (b). This court has jurisdiction of this petition pursuant to 29 U.S.C. § 160(e).

Respondent is engaged in the manufacture of house trailers at Riverside, California. Respondent's employees are represented by the San Bernardino-Riverside Counties District Council of Carpenters, United Brotherhood of Carpenters and Joiners of America, AFL–CIO. At the beginning of August 1964, respondent employed approximately one hundred and ten persons and was producing twenty mobile homes per week.

In late 1964 respondent was engaged in negotiations for a collective bargaining agreement with the union. On August 6, 1964, a number of respondent's production workers went on strike in support of their contract demands. Approximately one-half of respondent's employees either did not go on strike, or crossed the picket lines to return to work within a few days. Respondent immediately began to hire replacements for those who did strike and by August 18, 1964 had hired twenty-one new employees.

On August 18, 1964, the union agreed to end the strike and to accept respondent's last contract offer. The parties agreed that the strikers would not be put on a preferential hiring list but would be considered on a nondiscriminatory basis if they applied for employment. At the conclusion of the strike respondent did not return to its full pre-strike production force but determined to continue production with the crew of seventy-one which it had at the end of the strike. The six employees or former employees who are the complaining parties in these proceedings applied for employment on August 20, 1964. Between October 8

and October 16, 1964, respondent hired six new employees and passed over the strikers in doing so. The strikers were not rehired until December 1964.

On September 10, 1964 (before any hiring or any "passing over"), the complaining former employees filed a complaint with the NLRB. An amended complaint was filed in November 1964. Hearings were had before Trial Examiner Wallace E. Royster on February 17, 1965, and on April 16, 1965 the trial examiner filed his decision. In it he found that respondent had committed an unfair labor practice by treating its former employees as applicants for new employment without any employee status, in violation of section 8(a) (1) and (3) of the National Labor Relations Act. On June 24, 1965, a three member panel of the NLRB (Fanning, Brown, Jenkins) adopted the decision and recommendations of the trial examiner. This petition by the NLRB for enforcement of its order followed.

We first note that it is undisputed that there was in this case no conscious intent on the part of the employer to discriminate. The trial examiner so found, and the Board affirmed. With this in mind, we turn to specific facts.

The main issue at dispute in these proceedings is whether or not the complaining strikers had been replaced or their jobs absorbed while they were on strike. If their jobs had not been filled or eliminated due to a decrease in production, the strikers were entitled to be treated as employees and to be given preference over other job applicants.

Section 8(a) (1) and (3) of the NLRA which respondent is alleged to have violated in hiring new applicants before rehiring the six complaining strikers provides:

"§ 8.  Unfair Labor Practices.

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

\* \* \* \* \* \*

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization:
\* \* \*"

The leading case interpreting this section held that the employer has a duty to reinstate those strikers who had not not been permanently replaced, but need not remove replacements to reinstate the strikers. N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938).

The disagreement in the present proceedings centers on whether the jobs of the six complaining strikers had been filled so as to remove the requirement on respondent to rehire them on a preferential basis. Respondent contends that it cut back its labor force and production plans during and following the strike, and that as a result, the jobs of the strikers were either abolished or absorbed by other employees; and that such abolition or absorption amounts to replacement. Petitioner, on the other hand, contends that respondent intended to return to pre-strike production levels as soon as possible and that an employee who has been laid off retains his status as an employee and his right to preferential rehiring as long as he has a reasonable expectation of recall within the foreseeable future.

Respondent's contention that the abolition or absorption of a job is equivalent to replacement is a correct statement of the law. Atlas Storage Division, 112 NLRB 1175 (1955), enforced sub nom. Chauffeurs, Team. & H., etc. v. N. L. R. B., 233 F.2d 233 (7th Cir. 1956). It remains to be seen whether respondent's factual view of the case, or that of petitioner, is supportable. But before passing to an examination of that question, we first desire to deal with petitioner's legal contention that an employee who has been laid off retains his status as an employee and his right to preferential rehiring as long as he has a reasonable expectation of recall to work within the foreseeable future. In sup-

port of this position petitioner cites Servel, Inc., 65 NLRB 1067 (1946); Hubbard & Co., 45 NLRB 1 (1942); Drayer-Hanson Incorporated, 86 NLRB 111 (1949); Glenn I. Martin Co., 74 NLRB 546 (1947); General Motors Corp., 113 NLRB 876 (1955); Lima Hamilton Corp., 87 NLRB 455 (1949). All of these cases deal with the question of whether employees who had been laid off, but who (it was contended) would probably be recalled in the foreseeable future, *should be permitted to vote in a representation election.* To our knowledge the National Labor Relations Board has never applied this "reasonable expectation of recall within the foreseeable future" as a test to determine whether or not a striker has been replaced. And we are not inclined to do so. Many of these cases make it clear that the policy is based on the theory that employees who are quite certain to be recalled should be given a voice in selecting the bargaining agent who will represent them. Such an element does not here exist. An examination of the facts of the individual case seems preferable where the question is one of whether an employer has committed an unfair labor practice.

■ Turning to the factual merits of respondent's contention that the jobs of the complaining strikers had been absorbed or abolished as a result of reduced production following the strike, we are met at the outset with the existence of a Board decision laying down the rule that the question of whether or not a striker has been replaced is to be determined on the date on which the striker makes his offer to return to work. Brown and Root, Inc., etc., 132 NLRB 486, 493 (1961). The trial examiner referred to this case and held that it was not controlling, without discussing why it was not controlling. (CT 13.) We cannot agree with the trial examiner. We find it difficult to approve the Board's cavalier use of precedent when it desires to follow it, and the disregard of it when it wishes to achieve a different result. On the basis of the Board's own policy as stated in

*Brown and Root,* supra, we hold that whether or not a vacancy exists must be determined at the time the strikers apply for work after the strike.

■ Tested by this standard the record in these proceedings is devoid of any evidence to establish that the jobs of the six complaining strikers were still available on August 20, 1964, when they applied for reinstatement. The respondent had made a decision during the strike to curtail production. The work force at the end of the strike numbered seventy-one employees, and despite the testimony of the administrative vice-president of respondent that the longest it would take to secure any supplies would be thirty days (RT 73), respondent did not hire any additional employees until October 8, 1964, at a point when its labor force had fallen to sixty-eight employees—three less than at the end of the strike on August 18.

Petitioner's only support for its argument that the jobs had not been filled, abolished, or absorbed with responses by officers of respondent to questions of the representative of the General Counsel to the effect that respondent intended "at sometime in the future" to increase production to twenty units per week:

"Q But it was your intention to go back to twenty a week at some future time?

"A Yes." (RT 72.)

"Q And you did intend at all times to get production as quick as possible up to 20 trailers a week?

"A Correct." (RT 111.)

■■ But such an intent directed to the future is not determinative of the question of whether or not the jobs had been abolished, tested as of the date when the strikers applied for work, two days after the strike ended. Whatever its intent, respondent did not increase its work force until two months after the strike ended, and did not attain the pre-strike level of production until five months

after the strike.[1] In light of these circumstances we do not find that the General Counsel has established that the jobs of complainants had not been absorbed or that they were still available. Rather, we believe that the record demonstrates that the jobs had been abolished or absorbed for an indefinite time and only later were they recreated.

Having found that the General Counsel is unable to support the decision of the Board with substantial evidence on the record taken as a whole, we find it unnecessary to consider the effect of the nonpreferential rehiring agreement entered into between the respondent and the union. Whether that agreement excused respondent from rehiring the strikers even if their jobs had not been absorbed, as contended by respondent, or was insufficient to waive the employees' rights guaranteed them by the NLRA, or whether such rights could not be waived, as contended by petitioner, is not before us, and we express no opinion thereon.

Enforcement of the order is denied.

POPE, Circuit Judge (concurring):

I concur. I think it helpful to note just what the Board decided in Brown and Root, Inc., etc., 132 NLRB 486, 493 (1961). It there held that the employer has no obligation to seek out or to prefer economic strikers for vacancies which opened up after their applications. The Board in that case cited Atlas Storage Division, 112 NLRB 1175, enforced, 233 F.2d 233, 237–238 (7th Cir.) which held that a company has no duty to seek out an economic striker when no vacancy existed at the time of his request to return to work, but rather opened up later. The Board in the later case went on to say that the employer's duty was merely to refrain from discriminating against

the striker should he request employment again.

Plainly the holdings in those cases precisely fit the question raised here. When these complaining employees applied for reemployment on August 20th, 1964, there was no vacancy. Some of them reapplied later, but there is no proof that any vacancies existed at those times either. Under the rule of the above cases, the employer owed no duty to seek out or prefer these strikers for the positions that opened between October 8th and October 16th, 1964.

The examiner wholly disregarded these earlier rulings, saying "The Board has held that employees who have not been permanently replaced before the end of a strike must be reinstated to their former positions as work becomes available and before new employees are hired." That was an incorrect statement.

I do not question the right or power of the Board to change its rules from time to time. But when the employer here hired these six new employees, it did exactly what the Board had held it had the right to do. To change its declared policy, and make the change apply retroactively to the respondent's acts which were entirely proper when performed was arbitrary, capricious and an abuse of discretion—the sort of thing the Administrative Procedure Act, Title 5, § 1009 (e), directs us to set aside. In National Labor Relations Board v. Guy F. Atkinson Co., 195 F.2d 141, 149 (9th Cir.), we said:

"We think it apparent that the practical operation of the Board's change of policy, when incorporated in the order now before us, is to work hardship upon respondent altogether out of proportion to the public ends to be accomplished. The inequity of such an

1. In Atlas Storage Division, 112 NLRB 1175 (1955), enforced sub nom. Chauffeurs, Team. & H., etc. v. N.L.R.B., 233 F.2d 233 (7th Cir. 1956), the Board and court found that a striker's job had been absorbed and he was thus not entitled to preferential reinstatement when a job opening occurred only three days after he had made application for reinstatement. In N.L.R.B. v. Roure-Dupont Mfg., 199 F.2d 631 (2d Cir. 1952), the court found the strikers' jobs had been absorbed when vacancies occurred one month after the strike ended. Obviously, here there was a longer period of time.

impact of retroactive policy making upon a respondent innocent of any conscious violation of the act, and who was unable to know, when it acted, that it was guilty of any conduct of which the Board would take cognizance, is manifest. It is the sort of thing our system of law abhors."

ELY, Circuit Judge (dissenting):

I do not agree with the result reached in the majority opinion, and I cannot accept the reasoning which produces it.

When a workman chooses to join his fellows in an economic strike he takes certain risks. Among these is the risk that he may be unable to regain his position after the strike if another workman has permanently replaced him. E. g., NLRB v. Mackay Radio & Tel. Co., 304 U.S. 333, 345–346, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). There were no permanent replacements in the jobs in question here, but it is said that the striking employees lost their preferential status because their jobs were "abolished" or their work was "absorbed" by other employees. This I cannot see. Before the strike, there were about one-hundred-ten employees. When the strike ended the number had decreased to seventy-one. It is undisputed that the employer always held the intent to resume full production as quickly as possible following the termination of the strike and, with the same haste, to return to the full complement of its prestrike labor force.

When the strike was terminated, the six employees here involved, almost immediately, made applications for reinstatement into their positions. The majority holds that these applications were ineffective because the employer did not yet, at the very time the applications were received, have the jobs available. In the light of the employer's expressed intention to fill the positions "as quickly as possible", this holding cannot, I submit, be justified. I would hold that reinstatement applications of economic strikers should continue in operative effect until the time when the normal course of resumed production creates the necessity to accomplish the intended reopening of jobs which have remained unabolished and not permanently absorbed and in which there have not been permanent replacements.

No other persons had replaced the striking workmen in the jobs which they had held before the strike and which they resought after the economic differences had been adjusted. Their jobs had not been "abolished", for "abolish" means "to do away with wholly" or "to destroy completely". The fact that the challenged hirings were made within about six weeks after the strike had terminated should conclusively establish that the work of at least three jobs [1] had not been permanently "absorbed" by others. If a striking workman should not be denied his preferential rights unless there has been a permanent replacement, then he should not be denied those rights unless there has been complete abolition of his job or permanent absorption of his work by others. There was no such permanence here.

The Board has made factual determinations, which, if supported by substantial evidence, we are obliged to uphold. 29 U.S.C. § 160(e); NLRB v. Mrs. Fay's Pies, 341 F.2d 489, 492 (9th Cir. 1965). As I see the evidence, it is so substantial in its support that the Board's decision, in its principal thrust, was compelled.

I believe that my Brothers misapply the decisions in two cases, the facts in neither of which I can see as being analogous to those before us. One, Chauffeurs, Teamsters and Helpers General Local No. 200 v. NLRB, 233 F.2d 233 (7th Cir. 1956), enforcing the order in Atlas Storage Division, 112 N.L.R.B. 1175 (1955), dealt with a job wherein the work of the economic striker who formerly occupied it had been permanently absorbed. It was held that the striker was not entitled to reinstatement in a job which the employer, for economic rea-

---

1. See footnote 2, infra.

sons, had abolished or the work of which had been absorbed. The court held that so long as the employer did not discriminate against the striker in rehiring, it had no obligation to seek him out. The striker sought to replace an employee who had been injured. The job was not, as were those here, one which had become available as the employer followed the course of expressed intention to rebuild its labor force and production to the prestrike level. There is no indication in the cited opinion that the employer intended to or actually did resume its prestrike labor force, and the court in no way indicated that it would approach the two situations in a similar manner.

The second case involved economic strikers who had been permanently replaced during a strike. Brown and Root, Inc., 132 N.L.R.B. 486, 493 (1961). The number of the replacements exceeded the number of striking workers. These are significant facts, and they are contrary to the facts in the case at bar. When, in *Brown and Root*, the Board wrote, "In the circumstances of this case, we hold that [the employers] had no obligation to seek out or prefer the [economic] strikers for vacancies which opened up after their application. * * *", its remarks were clearly directed to the facts before it. Inasmuch as the labor force in Brown and Root, Inc. exceeded the prestrike number at the time of the strikers' applications for reinstatement, it seems undeniable that the vacancies occurred because of the need to replace workmen who had already permanently replaced the striking workmen.

If I have properly distinguished the cited cases from the present case, as I believe I have, the majority's direct and

rather severe criticism of the Board is unjustified.

The right to strike is a precious right. It is, too often, the workman's only weapon and his only shield against oppression. The majority opinion can have no other effect than to intimidate those who believe themselves to be economically aggrieved, especially those who, for long tenure, have earned valuable benefits which they should not be required to expose to new risks, judicially created or enlarged by an inferior tribunal. It seems to me that our court now imposes an unnecessarily restrictive impairment upon the free and lawful exercise of a laborer's will.

I would enforce the order of the Board.[2]

2. The majority opinion reveals that when the reinstatement applications were made, there was a labor force of seventy-one and that when the October hirings occurred the number had decreased to sixty-eight. Therefore, as to the six hirings of that time, three of the available jobs might be found to be of the same nature as those in Brown and Root, Inc., supra, i. e., jobs vacated by three permanent replacements. If this were true, then I

would not, of course, enforce the order, as written, in its entirety.

If the views expressed in my dissenting opinion had been shared by one of my Brothers it would then have been necessary to face, four-square, the effect of the nonpreferential hiring agreement between the union and the employer. No present purpose could be served by an indication of my opinion on this question.