**PORTLAND WILLAMETTE COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 74-2426.

United States Court of Appeals, Ninth Circuit.

March 31, 1976.

As Amended on Denial of Rehearing and Rehearing En Banc June 14, 1976.

James B. Ruyle (argued), of Sabin, Newcomb, Sabin & Meyer, Portland, Or., for petitioner.

William Stewart (argued), NLRB, Portland, Or., for respondent.

## OPINION AND ORDER

Before KILKENNY and GOODWIN, Circuit Judges, and EAST,[*] Senior District Judge.

KILKENNY, Circuit Judge:

Petitioner, Portland Willamette Company (Company), seeks to have this court set aside an order of the National Labor Relations Board (Board). The Board has cross-petitioned for enforcement of its order. It found that the Company violated § 8(a)(1) and (3) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(1) and (3). We deny the petition for enforcement and set aside the order of the Board.

## FACTS

In April, 1972, the Sheet Metal Workers International Association, Local No. 544, AFL–CIO (Union), was certified by the Board as the bargaining representative of the Company's production and maintenance employees. During collective bargaining, the Union demanded that any increased wage rates be paid retroactively to the beginning of the month in which negotiations commenced, May, 1972. This demand was reasserted throughout the negotiations.

On August 14th, a strike began and all but one of the 163 employees within the bargaining unit went out on strike. On September 20th, an oral proposal was made by the Company agreeing to retroactive pay increases to cover work performed during the period May 1st to August 14th, providing that the retroactive pay be given only to those on the payroll as of December 15, 1972. No agreement was reached on the package of which this offer was a part. In discussion of this proposal, the Company explained that it desired to wait until December 15th before making the payment because it was customary in the fireplace fixture industry to send out goods early in the year and to bill in October and November with most payments coming due by the 10th of December, resulting in a large cash inflow at that time. The Company was also concerned that if payment was made immediately after the conclusion of a contract, then appearing imminent, employees would return only for a brief time, perhaps from other jobs, collect the retroactive pay and leave. As fall is the busy season in the industry, the Company desired to have returning employees stay throughout the season. In negotiations with a prior bargaining representative, the Company had made a similar proposal which had been accepted.

After September 25th, no further bargaining meetings took place, although there were informal meetings with a Commissioner of the Federal Mediation and Conciliation Service until mid-October. At these October meetings the Company expressed a willingness to bargain without attached conditions, but after September 25th, the Union never again called a bargaining session.

At a meeting on September 22nd, Klein, the Union business manager, told representatives of the Company that the employees, not the Union, had wanted to strike, and that the employees had got it out of their system and wished to return to work. Klein said that he had told the employees that if "any of them that want to go back to work, they can do so." Prior to December 15th, 94 of the employees who had gone

---

* The Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

out on strike in August were back. The total shop force, including strike replacements had risen to 266, as compared with 163 at the time of the strike. In addition, 13 persons who had been out on strike had returned and subsequently left. Thus, 107 of the 162 employees who had originally gone out on strike had returned at some time prior to December 15th, approximately 66 percent of the original group.

At the trial before the Administrative Law Judge, testimony was given that on August 14th, when the strike began, 47 workers had been with the Company for less than six months. Company experience showed a normal turnover of about 60 percent among employees during their first six months. After December 15th, only four or five of the original strikers returned; they were reinstated. As to those remaining strikers who had not returned prior to December 15th, only one, a picketer, continued to be engaged in concerted activity. No evidence was introduced to show that the others had not taken other employment at some time prior to December 15th.

On October 5th, the Company sent the Union a letter referring to an earlier conversation. The letter advised the Union that in view of the deadlock in negotiations, the Company was going to institute the wage portions of its last proposal beginning with the then current payroll period. As part of the implementation of this proposal, on December 15th, those who were on the payroll, actively working, and who were entitled to retroactive pay received it. Persons who had originally gone out on strike, who had returned, and who were not actively employed on December 15th did not receive the retroactive pay. Persons who originally went out on strike who were not on the payroll December 15th, but who returned later were reinstated with all seniority rights, but did not receive the retroactive pay. Persons who originally went out on strike and who had not returned at any time did not receive the retroactive pay. Strike replacements and new employees who had not worked prior to commencement of the strike on August 14th, did not receive retroactive pay for the period prior to that date.

From November 1st until the payments were made, there was only one picket at the Company's plant, an employee, always the same man. He was still picketing on December 6, 1973. A letter written by Klein and sent to the Company on February 15, 1973, was introduced at the trial. The letter said,

"The strike at Portland Willamette Company continues, and will continue until the Company comes to the bargaining table to solve differences between strikers and the company."

A letter to the Company, dated February 27, 1973, containing a resolution of the Musicians' Mutual Association, supporting a strike at the Company was also introduced. Testimony was given that the Company had received similar letters between August 14th and the end of 1972, but none as to the dates they were received.

Just prior to the time when the Union's certification year was drawing to a close, Klein filed a complaint with the Board asserting that failure to pay the retroactive pay to those workers who had not returned to work prior to December 15th was an unfair labor practice. After trial, the Administrative Law Judge found that the selection of persons for retroactive pay increases was not based upon whether or not they were strikers. However, he found that the strike was still continuing on December 15, 1973. This led him to conclude that putting the Company's proposal in effect interfered with rights of individuals to participate in the strike by setting limits upon the time by which the strike had to end in order for strikers to obtain a particular benefit. This, he held, was an unfair labor practice.

Upon review, the Board, apparently concluded that the proposal did not constitute an offense when it was made on September 20th, observing that it was not intended to be a cutoff for the strike. However, limiting payment of the retroactive pay to those on the payroll as of December 15th was said to be inherently destructive of the right to

strike, the Board observing that even if its impact upon the right to strike was comparatively slight, the Company failed to show a legitimate business purpose for its action on December 15th. Therefore, the majority found the action of the Company unlawful under *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), and *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), even though they also found that the Company neither foresaw nor intended anti-union consequences.

## SCOPE OF REVIEW

■ The role of the court of appeals in reviewing a decision of the Board is to determine (1) whether the order was supported by substantial evidence on the record as a whole, or (2) whether the Board misapplied the law. *NLRB v. Insurance Agents' International Union*, AFL–CIO, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960).

## ANALYSIS

■ Normally, to sustain a finding that an employer has committed an unfair labor practice there must be an affirmative showing of an unlawful motivation to either discourage union membership or interfere with the exercise of protected rights. *NLRB v. Great Dane Trailers, Inc., supra*, recognizes exceptions to the requirement of an affirmative showing of unlawful motivation in two circumstances. The first is when the employer's conduct is inherently destructive of the employees' right to strike or engage in collective bargaining. Such conduct is conduct which carries with it " . . . 'unavoidable consequences which the employer not only foresaw but which he must have intended' and *thus bears 'its own indicia of intent.'*" 388 U.S. at 33, 87 S.Ct. at 1797, 18 L.Ed.2d at 1034. [Emphasis supplied].

■ Those cases finding an employer's conduct inherently destructive, bearing their own indicia of intent, are cases involving conduct with far reaching effects which would hinder future bargaining, or conduct which discriminates solely upon the basis of participation in strikes or union activity. Examples of inherently destructive activity are permanent discharge for participation in union activities, granting of superseniority to strike breakers, and other actions creating visible and continuing obstacles to the future exercise of employee rights. *Inter-Collegiate Press, Graphic Arts Division v. NLRB*, 486 F.2d 837 (CA8, 1973). Here the conduct complained of, granting the retroactive pay increase to workers who had returned and remained at work on December 15th, was limited to a particular instance and could have no continuing consequences such as the granting of superseniority, as in *Erie Resistor Corp. v. NLRB, supra.*

■ In this case, the Administrative Law Judge found that the "selection of persons for retroactive pay increases could not be said to have been based on whether or not they were strikers or nonstrikers as such." The Board further found that when the proposal was originally made, "neither did . . . [the Company] intend the proposal, nor did the Union treat it as providing a cutoff date for abandonment of the strike." Under these circumstances, implementing the proposal to make retroactive payments on December 15th cannot be said to be inherently destructive. There is no basis for saying that it "bears its own indicia of intent."

The second circumstance in which *Great Dane* relieves the Board of the necessity of proving anti-union animus arises when an action of an employer which serves no substantial and legitimate business end has a "comparatively slight" effect upon employee rights. It is the finding of the Board that no substantial and legitimate business end was served by the retroactive pay increase on December 15th and that it was, therefore, not necessary to prove improper motivation.

Given the fact that there was a "comparatively slight" effect upon employee rights, when the proposal was implemented on December 15th, there was ample business justification for the proposal when it was made, as the dissenting member found.

Nothing in the opinion of the Board suggests that it found otherwise. Nevertheless, the Board concluded that there was no business purpose in December for implementation of the proposal in a manner that excluded those who had not returned to work.

The reason given by the Board for this finding is that all goals sought to be accomplished by delaying the payment had been accomplished prior to December 15th. If the proposal had a legitimate business purpose when made, then it makes no sense to find that its implementation lacked a legitimate business purpose because workers had already been encouraged to remain through the busy season and a cash flow was available.

In the final analysis, we are compelled to agree with the dissenting member:

> "The promise of retroactive pay was intended only for those employees who returned to work and continued working for Respondent through December 15. Respondent would have been guilty of, in effect, perpetrating a fraud upon employees who remained in Respondent's employ in accordance with the terms of Respondent's offer if, on December 15, it had turned around and decided to award backpay to employees who quit before the cutoff date or did not return to work by that date. Respondent had the right to insist upon its credibility, just as the employees had the right to insist that the Respondent keep its promise."

Upon the facts of this case, we conclude, as we did in *NLRB v. National Seal, Division of Federal-Mogul-Bower Bearings, Inc.*, 336 F.2d 781 (CA9 1964), that the record, as a matter of law, will not support a finding against the employer.

Finally, we note that no discriminatory intent could have existed against persons who were no longer on strike as of December 15th and were no longer employees within the meaning of the NLRA. Only one of the 44 employees against whom discrimination is charged was shown to have been engaged in activity related to the original strike on December 15th, the lone pick-eter. No showing was made that the other 43 had not found substantially similar employment. Only five were shown to have been reinstated after December 15th.

Counsel for respective parties will prepare and present an appropriate order in conformity with the foregoing.