NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

OREGON STEEL MILLS,
INC., Respondent.

OREGON STEEL MILLS,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 92–70645, 92–70658.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 4, 1994.

Decided Feb. 22, 1995.

Wayne D. Landsverk, Newcomb, Sabin, Schwartz and Landsverk, Portland, OR, for respondent-cross-petitioner.

Aileen A. Armstrong, Peter Winkler and Fred L. Cornnell, N.L.R.B., Washington, DC, for petitioner-cross-respondent.

Before: ALARCON, NORRIS, and LEAVY, Circuit Judges.

Opinion by Judge NORRIS; Partial Concurrence and Partial Dissent by Judge ALARCON.

WILLIAM A. NORRIS, Circuit Judge:

The National Labor Relations Board seeks enforcement, and Oregon Steel seeks review, of the Board's November 30, 1990 order declaring that Oregon Steel violated sections 8(a)(1) and (3) of the National Labor Relations Act ("Act"), 29 U.S.C. §§ 158(a)(1) and (3), by failing to reinstate former strikers and removing five former strikers from the preferential reinstatement list. We grant enforcement of the Board's order.

## I

Oregon Steel challenges on three grounds the ALJ's and the NLRB's decision that Oregon Steel violated sections 8(a)(1) and (3) of the National Labor Relations Act[1] by bypassing qualified former strikers in favor

---

1. Section 8 of the National Labor Relations Act provides:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . .

of temporary workers obtained through independent employment agencies.

"An employer must reinstate an economic striker who offers unconditionally to return to work, unless the employer has a substantial and legitimate business reason for refusing to do so." *Zapex Corp. v. NLRB*, 621 F.2d 328, 333 (9th Cir.1980) (citing *NLRB v. Int'l Van Lines*, 409 U.S. 48, 50–51, 93 S.Ct. 74, 76–77, 34 L.Ed.2d 201 (1972)); *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1939)). "Although economic strikers may be permanently replaced, they are entitled to reinstatement when and if a job opens up for which the striker is qualified." *NLRB v. Champ Corp.*, 933 F.2d 688, 698 (9th Cir. 1990), *cert. denied*, 502 U.S. 957, 112 S.Ct. 416, 116 L.Ed.2d 437 (1991).

■ First, Oregon Steel argues that the General Counsel failed to make out even a prima facie violation of the Act because its obligation to hire former strikers from the preferential reinstatement list applies only when it "hires [new employees] onto its own payroll." Respondent/Cross–Petitioner Br. at 25, 28. The temporary workers were never on Oregon Steel's "own payroll" since Oregon Steel paid only the independent employment agencies who provided the temporary workers. The agencies, in turn, then paid the temporary workers their wages and fringe benefits. This distinction is irrelevant.

The fact that Oregon Steel paid the employment agencies, who then paid the temporary workers, does not change the fact that Oregon Steel hired others to work at the same exact jobs performed by the former strikers prior to the strike while the preferential reinstatement list remained unexhausted. This is the gravamen of the unfair labor practice alleged. As the Supreme Court noted in *Fleetwood*, and contrary to what the

Company argues here, "[t]he right [of a former striker] to reinstatement does not depend upon technicalities...." *Fleetwood*, 389 U.S. at 381, 88 S.Ct. at 547.

Second, Oregon Steel argues that the Board misapplied the law by placing on Oregon Steel the burden of proving that former strikers were not rehired for legitimate and substantial business reasons. Oregon Steel contends that it had only the burden of production. This argument is precluded by both Supreme Court and Ninth Circuit precedent.

In *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), the Court, faced with the same facts before us in the instant case—former strikers bypassed in filling positions,—made explicit that the employer bears the burden of proving a legitimate and substantial business justification:

> unless the employer who refuses to reinstate strikers can show[2] that his action was due to "legitimate and substantial business justifications," he is guilty of an unfair labor practice. *NLRB v. Great Dane Trailers*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967). *The burden of proving justification is on the employer. Id.*

389 U.S. at 378, 88 S.Ct. at 545–46 (emphasis added). In *NLRB v. Rockwood & Co.*, 834 F.2d 837 (9th Cir.1987), we followed *Fleetwood* in holding that when an employer fails to rehire striking workers and hires others in their stead, the employer has the burden of proving that it did so for legitimate and substantial business reasons. *Id.* at 840–41; *see also Zapex Corp. v. NLRB*, 621 F.2d 328, 334 (9th Cir.1980); *NLRB v. Murray Prods., Inc.*, 584 F.2d 934, 939 (9th Cir.1978).[3]

Finally, Oregon Steel asserts that "[t]he ALJ would apparently preclude employers

---

**2.** "To make apparent or clear by evidence, *to prove.*" Black's Law Dictionary 1379 (6th ed. 1990) (emphasis added).

**3.** *Accord Waterbury Hosp. v. NLRB*, 950 F.2d 849, 855 (2d Cir.1991); *Newport News Shipbuilding and Dry Dock Co. v. NLRB*, 738 F.2d 1404, 1408 (4th Cir.1984); *NLRB v. S. Greyhound Lines*, 426 F.2d 1299, 1302 (5th Cir.1970); *Wright Tool Co. v. NLRB*, 854 F.2d 812, 813–14 (6th Cir.1988); *NLRB v. Augusta Bakery Corp.*,

957 F .2d 1467, 1473 (7th Cir.1992); *Randall v. NLRB*, 687 F.2d 1240, 1245 & n. 7 (8th Cir. 1982), *cert. denied*, 461 U.S. 914, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983); *Midwest Solvents, Inc. v. NLRB*, 696 F.2d 763, 765–67 (10th Cir.1982); *Eastern Air Lines v. Air Line Pilots Ass'n Int'l*, 920 F.2d 722, 725 (11th Cir.1990), *cert. denied*, 502 U.S. 901, 112 S.Ct. 278, 116 L.Ed.2d 229 (1991).

with [preferential reinstatement lists] from contracting with outside agencies for labor," and that "[t]he ALJ is not charged with the responsibility of operating Oregon Steel Mills profitably for the benefit of its employee/owners." Petitioner/Cross–Respondent's Br. at 28. Oregon Steel exaggerates the reach of the ALJ's and the Board's decision.

■ The Board's affirmance of the ALJ's decision in this case hardly signals the death knell for the hiring of temporary workers post-strike. All the law requires is that the employer meet its burden of proving that the decision to hire temporary workers was made for legitimate and substantial business reasons. All the Board decided here is that Oregon Steel failed to provide sufficient evidence to carry its burden on this issue. The broad question framed by Oregon Steel— whether an employer with a preferential reinstatement list can ever contract with outside agencies for labor—is not before us. Certainly it is not the case that the hiring of temporary workers *always* constitutes a legitimate and substantial business justification. That question necessarily depends on the individual business circumstances of each employer. Thus, the question truly before us is whether this employer—Oregon Steel— carried its burden of proving that hiring temporary workers rather than rehiring former strikers was justified by a legitimate and substantial business reason.

Oregon Steel asserted that it did not rehire former strikers because it was cheaper to hire temporary labor. In holding that the evidence presented by Oregon Steel was insufficient to meet its burden of persuasion, the ALJ and the Board noted Oregon Steel's failure "to offer a financial or accounting analysis" of its purported cost savings, as well as its failure to "show a nexus between its use of contract labor and the company's economic health." ER at 25. The Board further relied on evidence showing that Oregon Steel (1) documents labor costs, yet failed to produce any records; (2) sometimes pays temporary workers "substantially more" than it pays other employees; and (3) significantly increased cost savings prior to its use of temporary workers. ER at 21–22, 25.

■ We must accept the Board's findings of fact if they are "supported by substantial evidence, ... even if the court might reach a different conclusion based on the same evidence." *Sierra Publishing Co. v. NLRB*, 889 F.2d 210, 215 (9th Cir.1989). The record amply supports the Board's finding that Oregon Steel did not carry its burden of proving that hiring temporary workers rather than rehiring former strikers was cost-justified.

## II

Oregon Steel also challenges the Board's holding that it violated the Act by (a) removing three former strikers from the preferential reinstatement list due to Oregon Steel's determination that these former strikers had received substantially equivalent employment elsewhere; and (b) removing two former strikers from the preferential reinstatement list due to Oregon Steel's determination that these former strikers had refused the Company's offer of substantially equivalent employment. Because the Board's findings are supported by substantial evidence, we reject Oregon Steel's contentions. We agree with the Board that the Company unlawfully removed these five employees from the preferential reinstatement list.

■ An employer may remove a former striker from a preferential reinstatement list if the former striker has found "regular and substantially equivalent employment" elsewhere. 29 U.S.C. § 152(3); *NLRB v. Rockwood & Co.*, 834 F.2d 837, 839 (9th Cir.1987). An employer may also remove a former striker if he or she refuses the employer's offer of substantially equivalent employment. *Rockwood*, 834 F.2d at 841–42.

"The words 'substantially equivalent' cover many things, including rate of pay, hours, working conditions, location of the work, kind of work, and seniority rights...." *NLRB v. Carlisle Lumber Co.*, 99 F.2d 533, 539 (9th Cir.1938), *cert. denied*, 306 U.S. 646, 59 S.Ct. 586, 83 L.Ed. 1045 (1939).

### A

Oregon Steel contends that it was not required to hire former strikers John Maxwell,

David Vasil, and Michael Loupe because they had found substantially equivalent employment · elsewhere. The Board adopted the ALJ's findings that each of these workers' post-strike positions were not substantially equivalent to their pre-strike positions.

### 1. John Maxwell

■ At Oregon Steel, Maxwell held a highly skilled position as a journeyman millwright. After the strike, Maxwell obtained employment as a *trainee* journeyman millwright at a local foundry. In addition to the reduced seniority, Maxwell also suffered a wage cut of approximately $4.22 an hour. These facts are substantial evidence in support of the Board's finding that Maxwell's new job at the foundry was not substantially equivalent to his pre-strike position at Oregon Steel.

### 2. David Vasil

■ Vasil's new job, unlike his position at Oregon Steel, required him to travel "100 percent of the time in the States of Oregon, Washington, Idaho and Montana." ER 11. The Board concluded, and we agree, that Vasil's new job was not substantially equivalent because of the requirement that he continuously travel away from his home and family in Portland.

### 3. Michael Loupe

■ At Oregon Steel Loupe ground and leveled steel plates and operated a rotary shear machine—all indoors. At his post-strike position at Schnitzer Company, Loupe worked outdoors in rain gear, removing mud and waste from car bodies. Furthermore, unlike Oregon Steel, Loupe's new employer did not provide shower facilities. In addition to the more onerous working conditions at Schnitzer, Loupe suffered reduced seniority and a reduced potential for advancement. This record amply supports the Board's finding that Loupe's new position was not substantially equivalent to his position at Oregon Steel.

### B

■ Oregon Steel contends that the jobs which it offered Dan Hunker and Jeanne Wilson were substantially equivalent to their pre-strike positions. Because both Hunker and Wilson rejected the job offers, Oregon Steel asserts that it lawfully removed them from the preferential reinstatement list. The Board found that the new positions offered by Oregon Steel were not substantially equivalent to Hunker's and Wilson's pre-strike positions. We agree.

Both Hunker and Wilson were offered positions as stores clerks. Stores clerks are required to work both nights and weekends. At their previous jobs with Oregon Steel, neither Hunker nor Wilson worked anything but the weekday shift. This record supports the Board's finding. *See NLRB v. Rockwood & Co.*, 834 F.2d 837, 841 (9th Cir.1987) (holding that two jobs were not substantially equivalent in part because one was on a more "onerous shift"—the graveyard shift).

We GRANT ENFORCEMENT of the Board's order in full.

ALARCON, Circuit Judge, concurring and dissenting.

I concur in Part II of the opinion.

I respectfully dissent from Part I of the opinion.

The ALJ concluded that Oregon Steel Mills, Inc. ("Oregon Steel") engaged in an unfair labor practice by failing to reinstate former strikers to positions occupied by employees of temporary service agencies. Robert Sikora, Oregon Steel's Vice–President of manufacturing, testified that the use of the employees of temporary service agencies was motivated solely to save 40% in its labor costs because it was not required to pay benefits to the contract workers. As I will explain below, the ALJ erroneously discredited as unbelievable Mr. Sikora's testimony of Oregon Steel's legitimate and substantial reasons in violation of the Supreme Court's decision in *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993).

The ALJ also held that Oregon Steel had failed to prove, as an affirmative defense,

that it had a legitimate and substantial business justification for "using contract labor and temporary employees to perform bargaining unit work when qualified employees on the preferential rehire list were available." The ALJ's ruling that proof of a legitimate and substantial business justification is an affirmative defense was in violation of the Supreme Court's decision in *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). In *Great Dane Trailers,* the Court held that the burden of persuasion does not shift to an employer until the General Counsel fulfills its burden of producing evidence that the employer's contract was inherently destructive to union activity. *Id.* at 34, 87 S.Ct. at 1797–98. The ALJ failed to make a finding that the employer's conduct in using temporary workers whose wages and fringe benefits were paid by independent employment agencies was inherently destructive to union activity. The absence of such a finding is understandable in light of the fact that the record shows that Oregon Steel reinstated 112 strikers after the work stoppage ended. Unfortunately, the majority has been persuaded by the ALJ's faulty analysis and application of relevant Supreme Court authority. The majority also has failed to discuss the requirement that General Counsel must demonstrate that the employer's conduct was inherently destructive before the burden of proof and persuasion shifts to the employer.

Because the majority has failed to set forth the facts that gave rise to the issues presented in Part I of its opinion, I will now set them forth so that the reader may judge which view is faithful to the governing principles of labor law jurisprudence.

## I.

### PERTINENT FACTS

Oregon Steel is a Delaware corporation that manufactures steel in Portland, Oregon. Between 1980 and September 1983, Oregon Steel was a party to collective bargaining agreements with two local unions of the United Steel Workers of America, AFL–CIO. Local 6380 covered all office and plant clerical workers, chemists, and laboratory employees. Local 3010 represented the maintenance and production workers.

In September 1983, Oregon Steel employed approximately 650 workers. On September 9, 1983, four hundred and eighteen union members, representing both bargaining units, engaged in an economic strike. One hundred and fourteen strikers crossed the picket lines and returned to work while the strike was in progress.

Shortly after the strike began, Oregon Steel implemented numerous operational changes. These included a wage cut, reduction of the work force to about 500 employees, a hiring freeze, transfer of the ownership of the company to an employee stock ownership plan, institution of a "cross-training" program to enable its employees to perform a variety of tasks, and the purchase of a new, high-powered furnace. All employees were paid a salary and were made eligible for profit sharing. Oregon Steel also began to use the services of temporary service agencies to perform work previously done by Oregon Steel employees. These changes resulted in increased productivity and profits for the company.

On June 26, 1984, the union made an unconditional offer to end the strike. The strikers offered to return to their former or substantially equivalent positions. In January 1985, the union was decertified as the collective bargaining representative for Oregon Steel's employees.

After the strike ended, Oregon Steel placed the names of the former strikers on a preferential reinstatement list for future job openings. In early 1987, the company lifted its hiring freeze. In the fall of that year, Oregon Steel determined that it had twenty-five permanent job openings available, primarily in the melt shop. At this time, approximately one hundred persons remained on the preferential reinstatement list. In order to determine which former strikers it should hire for the available positions, Oregon Steel held a series of orientation sessions. The company informed the strikers of the operational changes which it had implemented, and invited those who were interested in obtaining employment to describe their

post-strike employment by filling out a work history form.

In order to assist in the process of recalling former strikers, Oregon Steel hired Lon Southard, a management consultant. Southard conducted interviews with the former strikers to determine whether they would fit into the company's current work environment. Oregon Steel ultimately hired 112 workers from the preferential reinstatement list. Those individuals who were not hired and remained on the reinstatement list were given the opportunity to waive their right to preferential treatment in exchange for a payment of $250.00 per year of employment with the company.

In the fall of 1987, Oregon Steel expanded its reliance on contracts for services provided by temporary service agencies. Pursuant to these agreements, Oregon Steel paid the temporary service agencies a fixed amount for services previously performed by Oregon Steel employees. Under these contracts, Oregon Steel was not responsible for the payment of sick pay, vacation, or health benefits for the employees of the temporary service agencies. At the time Oregon Steel was utilizing the temporary service agencies, approximately one hundred former strikers remained on the preferential reinstatement list. By March 1989, employees of the temporary service agencies represented approximately five to ten percent of the persons performing work at Oregon Steel.

On February 8, 1989, the NLRB filed a second amended complaint against Oregon Steel. The Board alleged that Oregon Steel had violated sections 8(a)(1) and (3) of the Act. The ALJ issued his decision on July 6, 1989. He concluded that Oregon Steel violated sections 8(a)(1) and (3) of the Act by (1) using temporary service agency employees to perform work when qualified strikers remained on the preferential reinstatement list, (2) disqualifying eight employees for reinstatement because the company determined that they had received comparable employment elsewhere, and (3) striking the names of two employees from the preferential reinstatement list because the company determined that they refused an offer of substantially equivalent positions at Oregon Steel.

On November 30, 1990, the Board affirmed the decision of the ALJ. The General Counsel subsequently filed this application for enforcement of its order.

## II.

## ANALYSIS

An employer can respond to the threat of a loss of business or profitability during an economic strike by hiring workers to replace the strikers. *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938). When the strike ends, the employer may retain the replacement workers' services permanently. *Id.* As former strikers, union members are entitled to reinstatement when job openings occur. *NLRB v. Rockwood & Co.*, 834 F.2d 837, 839 (9th Cir.1987). "[T]he employer is not obliged to discharge the permanent replacements in order to make room for [economic strikers]." *NLRB v. Murray Prods., Inc.*, 584 F.2d 934, 938 (9th Cir.1978). The employer must, however, place the former striker on a preferential reinstatement list. *Laidlaw Corp. v. NLRB*, 414 F.2d 99, 103–05 (7th Cir.1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). "If and when a job for which the striker is qualified becomes available, he is entitled to an offer of reinstatement. The right can be defeated only if the employer can show 'legitimate and substantial business justifications.'" *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 381, 88 S.Ct. 543, 547, 19 L.Ed.2d 614 (1967) (quoting *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967)).

The evidence is undisputed that after the strike was over, Oregon Steel entered into agreements with agencies such as Kelly Temporary Services to use workers employed by such agencies to perform services at the mill. It is also uncontroverted that the preferential reinstatement list had not been exhausted when Oregon Steel entered into contracts with these temporary services agencies.

A. *The Burden of Producing Evidence and the Burden of Persuasion Under Great Dane Trailers*

In *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), the issue confronting the Supreme Court was whether an employer violates sections 8(a)(1) and (3) of the National Labor Relations Act, in the absence of a showing of antiunion motivation, by refusing "to pay striking employees vacation benefits accrued under a terminated collective bargaining agreement while it announced an intention to pay such benefits to striker replacements, returning strikers, and nonstrikers who had been at work on a certain date during the strike." *Id.* at 27, 87 S.Ct. at 1794. The Court found that the company's conduct in refusing to pay vacation benefits to striking employees was discriminatory and resulted in the discouragement of their participation in union activity in contravention of the Act. *Id.* at 32, 87 S.Ct. at 1796–97. The Court explained, however, that the mere existence of discriminatory conduct by an employer is insufficient to demonstrate the existence of a violation of the Act. *Id.* at 33, 87 S.Ct. at 1797. Rather, the relevant inquiry requires an examination regarding whether antiunion bias motivated the company's conduct. *Id.* The Court explained the relationship between antiunion bias and the nature of the employer's conduct as follows:

> First, if it can reasonably be concluded that the employer's discriminatory conduct was 'inherently destructive' of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, *if the adverse effect of the discriminatory conduct on employee rights is 'comparatively slight,' an antiunion motivation must be proved to sustain the charge if the employer has come forward with evidence of legitimate and substantial business justifications for the conduct.*

*Id.* at 34, 87 S.Ct. at 1798 (Emphasis added).

In *Fleetwood Trailer*, 389 U.S. 375, 88 S.Ct. 543, the Supreme Court was required to determine whether the employer violated the Act when it hired six new employees who had not previously worked for the company instead of six former strikers who had applied for reinstatement. *Id.* at 377, 88 S.Ct. at 545. No evidence was offered by the employer that it had a legitimate and substantial business justification for not reinstating the strikers. *Id.* at 380, 88 S.Ct. at 546–47. The Board held that the company discriminated against the strikers by failing to provide them with their right to reinstatement when the company hired nonstrikers. *Id.* We denied the Board's petition for enforcement of the order. *NLRB v. Fleetwood Trailer Co.*, 366 F.2d 126 (9th Cir.1966), *vacated*, 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967).

In *Fleetwood Trailer*, the Court cited its opinion in *Great Dane Trailers* for the proposition that "unless the employer who refuses to reinstate strikers can show that his action was due to 'legitimate and substantial business justifications,' he is guilty of an unfair labor practice." *Id.* at 378, 88 S.Ct. at 545 (citations omitted). Because the company failed to produce any evidence of a "legitimate and substantial business justification," the Supreme Court vacated this court's denial of enforcement of the Board's order. *Id.* at 380–81, 88 S.Ct. at 546–47.

When read together, the Court's decisions in *Great Dane Trailers* and *Fleetwood Trailer* establish the following labor law principles: In the ordinary situation where the company's conduct is not inherently destructive of employee rights, the normal rules governing the presentation of evidence in civil cases apply. *Great Dane Trailers*, 388 U.S. at 34, 87 S.Ct. at 1797–98. The General Counsel bears the initial burden of producing evidence to establish a prima facie case that the employer committed an unfair labor practice, and must make "*an affirmative showing* that the employer's discriminatory conduct was motivated by an antiunion purpose." *Loomis Courier Serv., Inc. v. NLRB*, 595 F.2d 491, 495 (9th Cir.1979) (emphasis added) (citations omitted). Once the General Counsel satisfies this requirement, the burden of going forward with the evidence shifts to the employer to demonstrate that it acted

for a legitimate and substantial business reason. If the employer produces such evidence, the burden of producing evidence shifts back to the General Counsel to rebut or impeach the employer's proof. The burden of persuasion that the employer's conduct was motivated by antiunion animus remains with the General Counsel throughout. *Great Dane Trailers*, 388 U.S. at 34. *See* 9 John H. Wigmore, *Wigmore on Evidence* § 2489 (James H. Chadbourn rev. 1981) (discussing the distinction between the burden of persuasion and the shifting burden of production).

Where the General Counsel initially produces evidence that shows that the employer's conduct is inherently destructive of employee rights, the employer bears the burden of persuasion, i.e., the burden of going forward with the evidence to demonstrate that its conduct was based upon a legitimate and substantial business reason, and, in addition, must persuade the ALJ that it acted without antiunion animus. *Great Dane Trailers*, 388 U.S. at 34, 87 S.Ct. at 1797–98. In other words, where the unfair labor practice is inherently destructive, the employer must demonstrate, as an affirmative defense, by a preponderance of the evidence, that the employer's conduct was not motivated by antiunion animus. Whether the burden of persuasion of antiunion animus shifts to the employer, or remains with the General Counsel, depends upon whether the General Counsel has produced evidence that the employer's conduct was inherently destructive of employee rights. There is no evidence in the record that would support a finding that Oregon Steel's conduct regarding the reinstatement of economic strikers was inherently destructive of employee rights. In fact, as noted above, Oregon Steel reinstated 112 strikers after the strike ended.

### B.  *Inherently Destructive Conduct*

The General Counsel argues that Oregon Steel's conduct in using employees on the payroll of temporary service agencies to perform duties previously executed by the economic strikers is "inherently destructive of employee rights, and it violates Section 8(a)(3) and (1) of the Act ... even in the

absence of specific antiunion motivation." Brief for NLRB at 20–21. In support of this contention, the General Counsel relies upon *Fleetwood Trailer, David R. Webb Co., Inc. v. NLRB*, 888 F.2d 501, 509 (7th Cir.1989), *cert. denied*, 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 743 (1990), and *NLRB v. Murray Prods., Inc.*, 584 F.2d 934, 939 (9th Cir.1978). The cited cases do not support the General Counsel's contention that a company's use of temporary service agency employees constitutes inherently destructive conduct.

We have previously noted that "[t]he phrase 'inherently destructive' is not easily defined and cases finding violations under this standard are relatively rare." *Loomis Courier Serv.*, 595 F.2d at 495 (citations omitted). Inherently destructive conduct requires that an employer's actions create "far reaching effects which would hinder future bargaining, *or conduct which discriminates solely upon the basis of participation in strikes or union activity.*" *Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir.1976) (emphasis added). In *Portland Willamette*, we cited the following as examples of inherently destructive conduct: "permanent discharge for participation in union activities, granting of superseniority to strike breakers, and other actions creating visible and continuing obstacles to the future exercise of employee rights." *Id.* (citations omitted). Other examples of inherently destructive conduct include (1) a "silent lockout" whereby the employer fails to provide timely notice to striking employees before or in immediate response to the strikers unconditional offer to return to work that it is engaging in a lockout to force the strikers to enter into a bargaining agreement favorable to the employer, *Eads Transfer, Inc. v. NLRB*, 989 F.2d 373, 376 (9th Cir.1993); and (2) terminating employees as a direct result of an employer's attempt to abandon a collective bargaining agreement during the effective date of the agreement without the consent of the union. *Los Angeles Marine Hardware Co. v. NLRB*, 602 F.2d 1302, 1307 (9th Cir.1979).

The principles announced in *Great Dane Trailers* and *Fleetwood Trailer* clearly require that the record demonstrate that an

agreement with a temporary service agency to provide services formerly performed by workers on the employer's payroll is inherently destructive conduct before an employer must demonstrate by a preponderance of the evidence that its business decision was not motivated by antiunion animus. In the absence of any evidence that the use of a temporary service agency is inherently destructive, an employer need only present evidence that it entered into such agreements for a legitimate and substantial business purpose.

The record does not indicate that the agreements with the temporary service agencies were inherently destructive of the rights of Oregon Steel's employees. No showing was made by the General Counsel that demonstrates that Oregon Steel discriminated against any economic striker "solely upon the basis of participation in strikes or union activity." *Portland Willamette Co.*, 534 F.2d at 1334.

Oregon Steel did not refuse to reinstate strikers after the work stoppage had ended because they exercised their right to strike. To the contrary, the record shows that Oregon Steel reinstated 112 economic strikers before the list of qualified employees was exhausted. The ALJ did not find that Oregon Steel's conduct was inherently destructive. The majority does not discuss this dispositive question.

Further, in this matter, unlike the situation in *Fleetwood Trailer*, Oregon Steel produced evidence that it acted for a legitimate and substantial business reason in entering into contracts with temporary service agencies. Byron Boyles, an industrial psychologist, testified that the use of contract workers assisted in the maintenance of a "stable and confident work force" because it enabled an employer "to create a buffer between the permanent work force and the demands of the moment." Robert Sikora, Oregon Steel's Vice President of manufacturing testified that the use of contract labor resulted in a savings of approximately forty percent on labor costs because the company was not required to pay the temporary service agencies' workers the same benefits that it paid its employees.

The ALJ discredited Sikora's testimony. According to the ALJ, Sikora's "mere assertion" of a savings in labor costs was insufficient. The ALJ indicated that Oregon Steel should have presented a financial or accounting analysis which documented the company's position. The ALJ's decision to discredit Sikora's testimony was erroneous. *See St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993) ("the determination that a defendant has met its burden of production ... can involve no credibility assessment.").

The majority has not attempted to justify the ALJ's failure to comply with decisions of this nation's highest court. Instead, it has masked the absence of analysis of the ALJ's serious misapplication of the law by invoking the rule that "[W]e must accept the Board's findings of fact if they are supported by substantial evidence, ... even if the court might reach a different conclusion based on the same evidence." Majority opinion at page 1994. This boilerplate recitation of a well known principle of law has no application to this case because the ALJ failed to consider relevant evidence of a legitimate and substantial business justification for the use of temporary employees because the ALJ considered it to be not credible. This ruling was in clear violation of the Supreme Court's instruction that in determining whether an employer has met its burden of production, the trier of fact must not assess credibility. *St. Mary's Honor Ctr. v. Hicks*, —— U.S. at ——, 113 S.Ct. at 2748. Thus, contrary to the majority's opinion, the ALJ's finding was fatally flawed because of the failure to accept as true undisputed and substantial evidence of a legitimate and substantial business justification for the employer's use of temporary employees. Because the ALJ erroneously assessed the credibility of Mr. Sikora's testimony that Oregon Steel's use of the temporary employees was driven by the fact that its costs were reduced by 40%, the finding that Oregon Steel did not meet its burden of proving a legitimate and substantial business justification must be rejected if we are to comply with the rule of law set forth by the Supreme Court in *St. Mary's Honor Ctr. v. Hicks*.

In discrediting Sikora's testimony, the ALJ relied upon *NLRB v. Vitronic Div. of Penn Corp.*, 630 F.2d 561 (8th Cir.1979), for the remarkable proposition that evidence of a forty percent labor cost savings represents an "administrative convenience" and not a legitimate and substantial business justification.

In *Vitronic*, the company required economic strikers entitled to preferential reinstatement to execute an application form in which they acknowledged that they must renew their applications within 6 months of their original application. *Id.* at 562. The company refused to reinstate persons from the preferential hiring list who did not renew their requests for reinstatement within six months. *Id.* The company hired new employees after the six month limitation period had expired. *Id.*

The ALJ in *Vitronic* found that the renewal procedure was at most "administratively convenient" for the company. *Vitronic Div. of Penn Corp. v. NLRB*, 239 N.L.R.B. 45, 48 (1978). The ALJ also stressed that "[i]t should be noted that Respondent has not set forth *either evidence or argument* that the procedure utilized here was prompted by 'legitimate and substantial business justification.'" *Id.* (emphasis added). The Eighth Circuit affirmed the ALJ's finding that the "Company's renewal procedure was designed to eliminate the preferential recall rights of economic strikers and was thus inherently discriminatory." *Vitronic*, 630 F.2d at 563. In this matter, Oregon Steel satisfied its burden of going forward with the evidence by presenting proof that the use of services provided by temporary service agencies reduced its payroll costs.

As described above, Oregon Steel satisfied its burden of production of evidence that it acted for a legitimate and substantial business purpose through Mr. Sikora's testimony. Because there is no evidence in the record that Oregon Steel's conduct was inherently destructive, the General Counsel was required to produce evidence that Oregon Steel was motivated by an antiunion bias in entering into contracts with temporary service agencies. *Great Dane Trailers*, 388 U.S. at 34, 87 S.Ct. at 1797–98. No such evidence appears in the record. Accordingly, the General Counsel did not satisfy the burden of persuading the ALJ and the Board by a preponderance of the evidence that Oregon Steel acted with antiunion animus. *Id.*

I would deny the Board's petition for enforcement of that portion of its order that requires the company to cease and desist from disqualifying for reinstatement former strikers displaced by the employees of temporary service agencies.